**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EZZARD CHARLES ELLIS,
*Petitioner-Appellant*,

v.

C. M. HARRISON, Warden,
*Respondent-Appellee.*

No. 16-56188

D.C. No.
5:05-cv-00520-SJO-JEM

ORDER

Appeal from the United States District Court
for the Central District of California
S. James Otero, District Judge, Presiding

Argued and Submitted En Banc June 18, 2019
San Francisco, California

Filed January 15, 2020

Before: Sidney R. Thomas, Chief Judge, and Michael Daly
Hawkins, Kim McLane Wardlaw, Jay S. Bybee, Consuelo
M. Callahan, Milan D. Smith, Jr., Mary H. Murguia,
Jacqueline H. Nguyen, Paul J. Watford, Andrew D.
Hurwitz and John B. Owens, Circuit Judges.

Order;
Concurrence by Judge Nguyen;
Concurrence by Judge Watford;
Dissent by Judge Callahan

# SUMMARY[*]

## Habeas Corpus

In light of the State of California's concession that relief is warranted, the en banc court filed an order (1) summarily reversing the district court's denial of Ezzard Charles Ellis's habeas corpus petition challenging his conviction for murder, attempted murder, and robbery; and (2) remanding for the district court to grant a conditional writ releasing Ellis from custody unless the State of California retries him within a reasonable period of time.

The en banc court granted relief after the State agreed to waive any bar to granting habeas relief imposed by *Teague v. Lane*, 489 U.S. 288 (1989), or by the Antiterrorism and Effective Death Penalty Act's exhaustion requirement; and conceded that Ellis's conviction should be overturned.

Concurring, Judge Nguyen, joined by Chief Judge Thomas and Judge Murguia, wrote separately because she strongly disagrees with the majority's refusal to explain its decision, particularly in the face of a vigorous dissent. Judge Nguyen wrote that Ellis's lawyer, a virulent racist who believed in the inferiority of racial minorities and allowed his repugnant views to infect his professional life, failed to provide reasonably competent representation to Ellis, who is African American. She wrote that states cannot waive the deference to their own courts' analysis that federal courts must accord under AEDPA; that this court is obligated to

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

decide whether Ellis received the effective assistance of counsel guaranteed by the Sixth Amendment; and that the state court's opinion here was "contrary to, or involved an unreasonable application of, clearly established Federal law."

Concurring, Judge Watford, joined by Judges Hawkins, Wardlaw, Hurwitz, and Owens, wrote separately to respond to the dissent's contention that the court's order granting relief is forbidden by 28 U.S.C. § 2254(d). Judge Watford wrote that § 2254(d) does not apply here because the claim on which this court grants relief was never adjudicated on the merits in state court.

Dissenting, Judge Callahan wrote that a concession by the State does not provide this court with the authority to do what it is prohibited from doing under § 2254(d), and that because Ellis is unable to show that the state court's denial of his Sixth Amendment claim is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," this court may not issue the writ. She wrote that the State can itself provide Ellis the relief that it now asserts he deserves, as well as pursue in state forums the "new rule of constitutional law" it now seeks.

---

## COUNSEL

Patricia A. Young (argued) and Mark Yim, Deputy Federal Public Defenders; Hilary Potashner, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Petitioner-Appellant.

Michael J. Mongan (argued) and Christine Y. Friedman, Deputy Attorneys General; Daniel Rogers, Supervising Deputy Attorney General; Julie L. Garland, Senior Assistant Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, San Francisco, California; for Respondent-Appellee.

Kent S. Scheidegger (argued) and Kymberlee C. Stapleton, Criminal Justice Legal Foundation, Sacramento, California, for Amicus Curiae Criminal Justice Legal Foundation.

Nathaniel P. Garrett, Jones Day, San Francisco, California; David M. Porter, Co-Chair, NACDL Amicus Committee, Sacramento, California; for Amicus Curiae National Association of Criminal Defense Lawyers.

Jason Anderson, District Attorney; Robert Brown, Chief Deputy District Attorney; Sean Daugherty, Supervising District Attorney; Mark Vos, Deputy District Attorney; San Bernardino County District Attorney's Office, San Bernardino, California; for Amicus Curiae San Bernardino County District Attorney.

---

## ORDER

Ezzard Ellis appeals from the district court's denial of his petition for a writ of habeas corpus.  On appeal, the State of California initially defended the district court's judgment, and a three-judge panel of our court affirmed.  *Ellis v. Harrison*, 891 F.3d 1160, 1166 (9th Cir. 2018) (per curiam), *reh'g en banc granted*, 914 F.3d 1188 (9th Cir. 2019) (order).  After Ellis petitioned for rehearing en banc, however, the State changed its position.  The State agreed to

waive any bar to granting habeas relief imposed by *Teague v. Lane*, 489 U.S. 288 (1989), or by the Antiterrorism and Effective Death Penalty Act's exhaustion requirement. Moreover, at oral argument before the en banc court, the State conceded that Ellis's conviction should be overturned.

In light of the State's concession that habeas relief is warranted, we summarily reverse the district court's denial of Ellis's petition. On remand, the district court is directed to enter an order granting a conditional writ of habeas corpus, releasing Ellis from custody unless the State of California retries him within a reasonable period of time. *Cf. Baca v. Adams*, 777 F.3d 1034, 1035 (9th Cir. 2015) (order).

**REVERSED AND REMANDED.**

---

NGUYEN, Circuit Judge, joined by THOMAS, Chief Judge, and MURGUIA, Circuit Judge, concurring in the majority's summary order granting relief and writing separately to explain the basis of the result:

Ezzard Ellis's lawyer, Donald Ames, was a virulent racist who believed in the inferiority of racial minorities. Worse, he allowed his repugnant views to infect his professional life—African American clients, court personnel, and lawyers were "niggers," and an Asian American judge was a "fucking Jap" who should remember Pearl Harbor. Ames was disloyal and entirely indifferent to the fate of his non-white clients, convinced that they were all stupid and deserved to be convicted.

I agree with the majority that Ames failed to provide reasonably competent representation to Ellis, who is African American. I write separately because I strongly disagree

with the majority's refusal to explain its decision, particularly in the face of a vigorous dissent. No settlement is on the books. The State of California now agrees with Ellis's interpretation of the law but does not agree to grant him the new trial he seeks. The parties have asked us, and we are obligated, to decide whether Ellis received the effective assistance of counsel guaranteed by the Sixth Amendment. To do so without a reasoned analysis in a case like this is a disservice to the parties, the victims' families, and the public.

While the state acquiesces in Ellis's legal analysis, we are not entitled to do the same. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which governs federal habeas review of state convictions, requires "substantial deference" to a state court's ruling on the petitioner's constitutional claim. *Nevada v. Jackson*, 569 U.S. 505, 512 (2013). As we and every other circuit to address the issue have held, states cannot waive the deference to their own courts' analysis that federal courts must accord under AEDPA.[1] Thus, the majority implicitly concludes that the state court's opinion here "was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), and that

---

[1] *See Amado v. Gonzalez*, 758 F.3d 1119, 1133 n.9 (9th Cir. 2014) ("[W]e have the obligation to apply the correct [AEDPA] standard, for the issue is non-waivable."); *see also Langley v. Prince*, 926 F.3d 145, 162–63 (5th Cir. 2019) (en banc) ("[A] State's lawyers cannot waive or forfeit § 2254(d)'s standard. That likewise means a State's lawyers cannot waive or forfeit the applicable 'clearly established law.'" (footnote omitted)); *Winfield v. Dorethy*, 871 F.3d 555, 563 (7th Cir. 2017) (same); *Moore v. Mitchell*, 708 F.3d 760, 781 (6th Cir. 2013) (same); *Gardner v. Galetka*, 568 F.3d 862, 879 (10th Cir. 2009) (same); *Eze v. Senkowski*, 321 F.3d 110, 121 (2d Cir. 2003) (same).

upon de novo review, Ellis is entitled to relief.  For reasons I will explain, I agree.

## I.

In June 1991, after five trials, a San Bernardino jury convicted Ellis of murder, attempted murder, and robbery, for which he is serving a sentence of life without the possibility of parole.  Ames was appointed as defense counsel in April 1990 after Ellis's first trial ended in a mistrial.  Ames represented Ellis for the remainder of the proceedings in the trial court.[2]

Ames's oldest daughter described her father's "contempt for people of other races and ethnic groups."  Ames "especially ridiculed black people, referring to them with racial invectives" such as "trigger the nigger" and "shoot the coon to the moon."  Ames's youngest daughter likewise recalled her father's frequent use of "racial slurs to refer to blacks and other minorities."

These offensive racial views were not confined to private conversations among family members.  Ames' utter contempt for people of color infected his professional life as well.  He openly expressed his belief that "[black] people can't learn anything," and, referring to his legal secretary at the time, stated that "he was going to fire that dumb little nigger" if his former secretary would agree to come back to work for him.  Ames more than once called the African American secretary a "dumb fucking bitch" to her face, and she left his employ in January 1991 after only four months.  A fiscal clerk at the San Bernardino courthouse during Ellis's trials heard Ames employ "racist terms to

---

[2] Ames died in 1999.

characterize court personnel, his employees, and his clients." Even in the presence of a courthouse employee, Ames referred to an Asian American judge as a "fucking Jap" who should "remember Pearl Harbor." Sometime in the first half of 1991, Ames told another legal secretary that his African American co-counsel was "a big black nigger trying to be a white man." At the time, Ellis's co-defendant had an African American attorney.

Significantly, Ames openly expressed hostility to his clients who were minorities. At work, Ames would "consistently refer to his African American clients as 'niggers.'" In May 1990, Ames described a client who had been sentenced to death as a "nigger" who "got what he deserved." He said of another client, Isaac Gutierrez, that "he deserve[d] to fry." Ames was indifferent to his clients' fate due solely to their race, stating that he "did not care what happened to" a client "because his client was black." At home, he made similar comments, leading his oldest daughter to believe that he "did not care about his clients, many of whom were black." According to his youngest daughter, Ames in 1990 or 1991 "described a case in which African-American men were accused of holding up or robbing someone at a fast food restaurant."[3] Ames "referred to his client in the case with racial slurs" and "commented on how stupid his client was."

Ellis first learned of Ames's extreme racism in 2003 when a friend sent him a newspaper article chronicling Ames's shoddy work as a capital defense attorney. The article described Ames as "deceptive, untrustworthy, and disloyal to his capital clients." Sara Catania, *A Killer Job:*

---

[3] The incident underlying Ellis's convictions took place at a McDonald's.

*How a Lousy Lawyer Landed Stephen Wayne Anderson on Death Row*, *LA Wkly.* (Jan. 23, 2002), https://www.laweekly.com/a-killer-job (quoting *Anderson v. Calderon*, 276 F.3d 483, 484 (9th Cir. 2001) (Reinhardt, J., dissenting from denial of rehearing en banc)). And it discussed Ames's daughters' testimony in another case regarding his "frequent use of deprecating remarks and racial slurs about his clients."

Ellis unsuccessfully petitioned the state courts for habeas relief. Among other things, he argued that his trial counsel provided constitutionally ineffective assistance because Ames's "racial prejudice against African-Americans" created an actual conflict of interest. Ellis then sought habeas relief in federal court. The district court determined that Ellis's Sixth Amendment claim lacked merit and denied the petition, and a three-judge panel of this court affirmed. *Ellis v. Harrison*, 891 F.3d 1160 (9th Cir. 2018) (per curiam), *reh'g en banc granted*, 925 F.3d 999 (9th Cir. 2019).

## II.

We cannot grant habeas relief under AEDPA unless the analysis "was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), or it "was based on an unreasonable determination of the facts," *id.* § 2254(d)(2). Therefore, before explaining why Ellis is entitled to relief, I first explain why the state courts' determination was contrary to clearly established law and thus not entitled to deference. The San Bernardino County Superior Court was the only state court to explain its decision, so I presume that the state appellate courts adopted its reasoning. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

## A.

## 1.

In *Strickland v. Washington*, the Supreme Court set forth the general standard for evaluating a claim of "actual ineffectiveness"—that is, a claim that counsel deprived a criminal defendant of the Sixth Amendment right to effective assistance "by failing to render 'adequate legal assistance.'" 466 U.S. 668, 686 (1984) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980)). The test is twofold: "the defendant must show that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Id.* at 687.

*Strickland* recognized, however, that not all claims of inadequate counsel are subject to this general test. For example, "prejudice is presumed" when counsel is actually or constructively denied and in certain contexts where the state interferes with counsel's assistance. *Id.* at 692 (citing *United States v. Cronic*, 466 U.S. 648, 659 & n.25 (1984)). "[A] similar, though more limited, presumption of prejudice" applies to an ineffectiveness claim predicated on counsel's actual conflict of interest. *Id.* (citing *Cuyler v. Sullivan*, 446 U.S. 335, 345–50 (1980)).[4]

---

[4] Judge Watford asserts that AEDPA does not apply at all because Ellis's "*Cronic* claim," as he puts it, was not "adjudicated on the merits" by the state court. 28 U.S.C. § 2254(d). But this slices the definition of "claim" too finely. To be fairly presented, "a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief." *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996). Here, Ellis's claim was that he was denied his Sixth Amendment right to effective counsel based on the fact that his attorney was racist. Describing this

Ellis argued that "he was deprived of the right to effective assistance of counsel because of a conflict of interest" that "stem[med] from [Ames's] racial prejudice against African-Americans."  The state superior court cited two cases that applied *Strickland*,[5] indicating that it was evaluating Ellis's claim under the general test for actual ineffectiveness claims rather than under *Sullivan*'s conflict rubric, as Ellis had argued.  Without addressing whether counsel performed deficiently, the court rejected Ellis's claim because he "ha[d] not reasonably shown . . . that, absent any or all of [Ames's] acts, the outcome of the trial would have been more favorable to him."  The court required Ellis to prove this prejudice "by a preponderance of evidence."

The state court's implicit ruling—that *Strickland*, rather than *Sullivan*, governs claims that counsel was ineffective due to racial bias—was not an unreasonable application of

---

contention as a "*Cronic* claim" or a "*Sullivan* claim" confuses an argument—why prejudice should be presumed—with a claim.  *Cf. Yee v. City of Escondido*, 503 U.S. 519, 534 (1992) ("Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.").  While Ellis framed his Sixth Amendment claim to the state court in terms of *Sullivan*'s conflict rubric, the state court ignored this argument and analyzed the claim under what it believed to be the *Strickland* standard.  The state court just as easily could have analyzed the claim under *Cronic*.   It certainly adjudicated Ellis's Sixth Amendment claim on the merits.

[5] *See Hill v. Lockhart*, 474 U.S. 52, 58–59 (1985) (holding that "the two-part *Strickland* . . . test applies to challenges to guilty pleas based on ineffective assistance of counsel"); *People v. Duncan*, 810 P.2d 131, 135–37 (Cal. 1991) (applying *Strickland* to claim that counsel "failed to engage in meaningful preparation for trial" and "misunderstood the law of felony murder").

the Supreme Court's Sixth Amendment jurisprudence. The Supreme Court has never addressed this type of claim, and a state court may reasonably choose one possible legal standard over another where the controlling law is uncertain. *See Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) ("[I]t is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." (quoting 28 U.S.C. § 2254(d)(1))). The Supreme Court "has repeatedly applied [*Strickland*] to evaluate ineffective-assistance-of-counsel claims where there is no other Supreme Court precedent directly on point." *Id.* at 122–23.

The state court decision was nonetheless contrary to clearly established federal law because it required Ellis to show prejudice by a preponderance of the evidence. *Strickland* held that "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 693. Rather, the defendant must show only "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The Supreme Court chose the "reasonable probability" standard for prejudice rather than a more demanding rule because "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.*

A state court decision is contrary to the Supreme Court's clearly established precedent "if the state court applies a rule that contradicts the governing law set forth in [the Court's]

cases." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). If, in light of *Strickland*, "a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be [contrary] to [the Supreme Court's] clearly established precedent." *Id.* at 405–06.

Because the state court decision denying Ellis's habeas petition was contrary to clearly established federal law, we "can determine the principles necessary to grant relief," *Lafler v. Cooper*, 566 U.S. 156, 173 (2012), and "must . . . resolve the claim without the deference AEDPA otherwise requires."[6] *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). We review Ellis's habeas petition "by considering de novo the constitutional issues raised." *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

**2.**

The dissent would constrain us, on de novo review, to the state court's choice of *Strickland* over *Cronic* despite our belief that this legal determination, though reasonable, is wrong. *See* Dissent at 39–40. De novo means "from the beginning." *Choctaw Nation v. United States*, 119 U.S. 1, 30 (1886). In other words, a court reviewing de novo "freely consider[s] the matter anew, as if no decision had been rendered." *Dawson v. Marshall*, 561 F.3d 930, 933 (9th Cir. 2009) (alteration in original) (quoting *United States v.*

---

[6] The state initially raised several defenses, including the principle that new rules of criminal procedure generally may not provide the basis for federal habeas relief from state court convictions, *see Teague v. Lane*, 489 U.S. 288, 310 (1989). The state now waives these defenses, as is its right. *See Danforth v. Minnesota*, 552 U.S. 264, 289 (2008).

*Silverman*, 861 F.2d 571, 576 (9th Cir. 1988)).  Rather than review de novo, the dissent would pick up the state court's legal analysis midstream, correcting its mistakes.  But as we explained in *Frantz*, de novo review requires consideration of the constitutional *issues*—not the state court's decision— without deference.  533 F.3d at 735.  Thus, once § 2254(d) has been met, we are free to rely on our own precedent in determining what the Constitution requires,[7] *see Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Burton v. Davis*, 816 F.3d 1132, 1141–42 & n.5 (9th Cir. 2016), whereas under AEDPA's deferential review we are not, *see Lopez v. Smith*, 574 U.S. 1 (2014).

That makes all the difference here.  The Supreme Court has not yet articulated the extent to which prejudice can be presumed from counsel's extreme racism.  *See Mayfield v. Woodford*, 270 F.3d 915, 925 (9th Cir. 2001) (en banc) (observing that "[i]t is by no means clear from precedent" that conflict due to defense counsel's racism is "cognizable under ineffective assistance case law").  Therefore, federal courts must defer to—even if they disagree with—a state court's requirement that a habeas petitioner show a reasonable likelihood that unbiased counsel would have produced a more favorable outcome.  Had the state court applied that standard here, we could not grant habeas relief because Ellis concedes that he cannot show prejudice under the general *Strickland* analysis.  But under our own precedent—in particular, *Frazer v. United States*, 18 F.3d

---

[7] Of course, even when "reviewing the merits of a habeas petitioner's claim after § 2254(d) is satisfied, we still defer to a state court's factual findings under § 2254(e)."  *Crittenden v. Chappell*, 804 F.3d 998, 1011 (9th Cir. 2015).

778 (9th Cir. 1994)—we can presume prejudice from counsel's extreme racial animus.[8]

This two-stage standard of habeas review balances the "important interests of federalism and comity" reflected in AEDPA, *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015), with our own obligation to "guard against extreme malfunctions in the state criminal justice systems," *Harrington v. Richter*, 562 U.S. 86, 102 (2011). If a state court reasonably applies Supreme Court precedent, it should not be overturned based on circuit precedent by which it is not bound. At the same time, if a state court's application of the law *is* unreasonable under principles that the Supreme Court has clearly established, then our own constitutional analysis should not be hamstrung by the state court's deeply flawed one. Outside of AEPDA, we owe no deference to a state court's interpretation of federal law. *See, e.g.*, *Clark v. Chappell*, 936 F.3d 944, 966 (9th Cir. 2019) (per curiam) ("Under pre-AEDPA standards, both questions of law and mixed questions of law and fact are subject to de novo review, which means that a federal habeas court owes no deference to a state court's resolution of such questions.").

---

[8] The three-judge panel, of which I was a member, concluded that *Mayfield* "implicitly overruled" *Frazer* to the extent it held that "defense counsel's extreme animus towards the persons of the defendant's race violates the Sixth Amendment without need to show prejudice." *Ellis*, 891 F.3d at 1165–66. That was true only insofar as *Frazer*'s analysis rested on *Sullivan*'s conflict analysis, *see Frazer*, 18 F.3d at 782–83, which was the only analysis at issue in *Mayfield*. *See Mayfield*, 270 F.3d at 925 (analyzing "ineffective assistance resulting from a conflict of interest"). Insofar as *Frazer* relied on *Cronic* for its holding, it remains good law. While Ellis did not argue a *Cronic* theory of relief to the state courts, the state has now affirmatively waived this impediment to review. *See* 28 U.S.C. § 2254(b)(3) (permitting consideration of unexhausted claims if "the State, through counsel, expressly waives the requirement").

In the AEDPA context, once we conclude that de novo review applies—a purposefully difficult hurdle, *see Richter*, 562 U.S. at 102—we no longer defer to a state court's reasoning that is inconsistent with our own precedent. *See Cooper*, 566 U.S. at 173; *Panetti*, 551 U.S. at 953; *Tarango v. McDaniel*, 837 F.3d 936, 945 (9th Cir. 2016).

## B.

The parties contend that under the circumstances of this case, the general *Strickland* analysis is inappropriate and, instead, prejudice should be presumed under *Cronic* and *Frazer*. I agree.

The Sixth Amendment provides a criminal defendant with "the basic elements of a fair trial" secured by the Constitution's Due Process Clauses, which include the right to effective counsel. *Strickland*, 466 U.S. at 684–85. When adjudicating a claim that counsel was actually ineffective, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696. "In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.*

A trial is fundamentally unfair if defense counsel harbors extreme and deep-rooted ill will toward the defendant on account of his race. For example, in *Frazer*, defense counsel's "verbal assault manifesting explicit racial prejudice" toward the defendant was "irreconcilable with . . . the duty of loyalty owed a client by his attorney" and the attorney's "responsibility of providing meaningful assistance." 18 F.3d at 783. Because "*[a]ll* advice, assistance, and guidance provided after such an outburst

would be fatally suspect," *id.*, we held that "the Sixth Amendment defect in this case would be so egregious if proved that 'a presumption of prejudice [would be] appropriate without inquiry into the actual conduct of the trial.'" *Id.* at 785 (alteration in original) (quoting *Cronic*, 466 U.S. at 660).

Here, although Ames did not abuse Ellis directly to his face with racial invectives, the Sixth Amendment defect in this case is no less extreme than in *Frazer*. Counsel's performance is the sum of countless discretionary actions—and inactions—on behalf of a client. Courts avoid second guessing these decisions when evaluating counsel's performance because trial counsel is far better placed than judges reviewing a cold record to know what will serve the defendant's interests. *See Strickland*, 466 U.S. at 689 (citing "the variety of circumstances faced by defense counsel" and "the range of legitimate decisions regarding how best to represent a criminal defendant" as reasons for the "wide latitude" courts accord counsel "in making tactical decisions"). When defense counsel makes these discretionary decisions in disregard of the client's interests on account of counsel's racism, the cumulative effect will be to impair the defense, but there is no way to pinpoint how it does so.

An attorney's nonverbal cues conveying racist contempt for the defendant—such as a sigh, a roll of the eyes, or a half-hearted closing argument—will never appear in the transcript but will no doubt influence the jury. *Cf. State v. Monday*, 257 P.3d 551, 557 (Wash. 2011) ("Not all appeals to racial prejudice are blatant. Perhaps more effective but just as insidious are subtle references. Like wolves in sheep's clothing, a careful word here and there can trigger racial bias."). Even harder to measure is the effect of actions

that defense counsel fails to take for no reason other than racist indifference to the defendant's fate. While the impact of some such failings can be objectively analyzed—an inadequate investigation, for example, can be judged by what it left undiscovered—for the most part we can only speculate how the result might have changed if counsel had performed his obligations with due vigor.

Here, for instance, Ellis argued that his counsel should have objected when the prosecutor struck all African Americans from his jury. Juries are less likely to convict African American defendants when at least one juror is black, *see, e.g.*, Shamena Anwar et al., *The Impact of Jury Race in Criminal Trials*, 127 Q.J. of Econ. 1017, 1032, 1048 (2012) (finding that difference in conviction rates for black and white defendants, 81% and 66%, respectively, disappeared when the jury pool included at least one African American), and Ellis's previous two trials, which resulted in hung juries, each had several black jurors. It is impossible to know how Ames's inaction in this instance affected the outcome. Objections to the peremptory strikes might well have been successful and an African American perspective on the jury might have resulted in another mistrial or even an acquittal.

In *Cronic*, the Supreme Court held that when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing" such that there is in effect a "complete denial of counsel," then in "[c]ircumstances of that magnitude," a "presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." 466 U.S. at 659–60. "[C]ertain circumstances are so egregiously prejudicial that ineffective assistance of counsel will be presumed." *United States v. Swanson*, 943 F.2d 1070, 1072 (9th Cir. 1991) (quoting *Stano v. Dugger*, 921 F.2d 1125,

1152 (11th Cir. 1991) (en banc)).    Defense counsel's documented extreme racist animus for a client creates an egregious circumstance that warrants the *Cronic* presumption of prejudice without searching the record, especially given the many invisible ways in which counsel's bias could have affected the trial.

To be clear, I do not suggest that every attorney who utters a racial epithet will be unable to adequately defend clients of a different race.    An attorney's racist statement outside the courtroom that has nothing to do with a client, though contemptible and potentially sanctionable,[9] does not in and of itself call for the reversal of every criminal conviction involving a defendant of the targeted race in which the attorney participated. *See* Sheri Lynn Johnson et al., *Racial Epithets in the Criminal Process*, 2011 Mich. St. L. Rev. 755, 785–86 (2011) (arguing that "[i]n general, unless [an attorney's racial] epithet is used to describe a

---

[9] For example, the North Carolina Supreme Court affirmed a white district attorney's removal from office after an incident at a bar in which he "loudly and repeatedly addressed a black patron using [a] derogatory and abusive racial epithet." *In re Spivey*, 480 S.E.2d 693, 695 (N.C. 1997).    Some state bars in the Ninth Circuit expressly prohibit racial discrimination during the course of an attorney's representation. *See* Cal. R. Prof'l Conduct 8.4.1 (providing that lawyers may not "unlawfully harass or . . . discriminate" against clients or potential clients on the basis of race); Or. R. Prof'l Conduct 8.4(a)(7) (providing that lawyers who "knowingly intimidate or harass a person because of that person's race" or "color" commit professional misconduct); Wash. R. Prof'l Conduct 8.4(g) (same for a lawyer who "commit[s] a discriminatory act prohibited by state law on the basis of . . . race . . . in connection with the lawyer's professional activities").    Others interpret ambiguous rules to prohibit this sort of misconduct. *See* Ariz. R. of Prof'l Conduct 8.4 cmt. (explaining that a lawyer may "engage in conduct that is prejudicial to the administration of justice," which is expressly prohibited, when the lawyer "knowingly manifests by words or conduct, bias or prejudice based upon race"); Idaho R. Prof'l Conduct 8.4 cmt. 3 (same).

criminal defendant, it should not trigger per se reversal" because "the point is whether or not the [attorney] has exhibited an intensity of bias that cannot be squared with race-neutral decision making" in a particular case).

The Sixth Amendment does not demand that a criminal defendant and his counsel share a worldview—merely that the attorney loyally represent the client's interests. *See Morris v. Slappy*, 461 U.S. 1, 13 (1983). There are many reasons a lawyer may not like a client. Criminal defense attorneys are accustomed to representing individuals who commit reprehensible acts, and we assume that they can set aside any personal distaste for such clients during the representation. *See Von Moltke v. Gillies*, 332 U.S. 708, 725–26 (1948) (plurality op.) (remarking that the "[u]ndivided allegiance and faithful, devoted service to a client" demanded of counsel by the Sixth Amendment is nowhere more honorable than when "the accused [is] a member of an unpopular or hated group, or . . . charged with an offense which is peculiarly abhorrent"). An attorney's racial biases against a client need not be any different.

In some cases, however, a lawyer's racial bias against racial minorities is so extreme and deep-rooted that it would be impossible for him to fairly represent a non-white defendant. Where there is clear and convincing evidence of such bias, we must presume that counsel's racism prejudiced the result. "To hold otherwise . . . would reduce a sacred right to worse than a sham." *Frazer*, 18 F.3d at 784.

Ames's frequent use of the worst racial epithets shows the depth of his antipathy for people of color. *See United States v. Henley*, 238 F.3d 1111, 1121 (9th Cir. 2001) ("We have considerable difficulty accepting . . . that, at this time in our history, people who use the word 'nigger' are not racially biased."). The overwhelming evidence of his

virulent racism is reliable, coming from his family and colleagues. That Ames felt free to express his racial hatred in the office and at the courthouse indicates he did not know or care that his views were unprofessional as well as repugnant. *Cf. Frazer*, 18 F.3d at 785 (noting "[t]he improbability of [a racist] outburst occurring between a retained counsel and his client"). And Ames targeted his racial invectives at African Americans involved in Ellis's trial, including Ellis himself. While representing Ellis, Ames called him "stupid" using racial slurs and stated that he "did not care what happened to" a black client on account of his race. Under these circumstances, it would have been impossible for Ames to represent Ellis fairly.

## III.

"Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have." *Frazer*, 18 F.3d at 782 (quoting *Cronic*, 466 U.S. at 654). Here, counsel's extreme racism rendered Ellis's trial fundamentally unfair and its result unreliable. For this reason, I concur in the majority's decision to reverse the district court's judgment denying habeas relief.

WATFORD, Circuit Judge, with whom HAWKINS, WARDLAW, HURWITZ, and OWENS, Circuit Judges, join, concurring:

I write separately to respond to the dissent's contention that the court's order granting relief is forbidden by 28 U.S.C. § 2254(d). That provision applies only when a claim has been "adjudicated on the merits" in state court. *Id.* It does not apply here because the claim on which the court

grants relief was never adjudicated on the merits in state court.

As the district court correctly determined, Ezzard Ellis raised three distinct ineffective assistance of counsel claims in his federal habeas corpus petition: one based on *Strickland v. Washington*, 466 U.S. 668 (1984); another based on *Cuyler v. Sullivan*, 446 U.S. 335 (1980); and a third based on *United States v. Cronic*, 466 U.S. 648 (1984). Ellis never raised his *Cronic* claim in state court, and thus the state courts never adjudicated that claim on the merits. While Ellis' failure to raise his *Cronic* claim in state court would ordinarily render the claim unexhausted, the State has waived the exhaustion requirement here, as it is permitted to do. *See* 28 U.S.C. § 2254(b)(3). As a result, § 2254(d) poses no barrier to the court's granting relief on Ellis' *Cronic* claim.

---

CALLAHAN, Circuit Judge, dissenting:

In 1989, Ezzard Ellis, and his co-defendant, Nathan Macon, senselessly shot and robbed two men who were sitting in their car at a McDonald's drive-through window. One victim died and the other was seriously wounded. Ellis was found guilty of murder beyond a reasonable doubt by a California jury. Since then, his conviction and sentence have repeatedly been upheld against various challenges in both California and federal courts.

Yet today, we grant Ellis federal habeas relief—but not because he has demonstrated his entitlement to such relief on the legal merits of his claims. Rather, we grant Ellis' petition because the State of California—after nearly three decades of defending the fairly-obtained conviction in this

case—wants us to write a new rule of constitutional law and vacate Ellis' conviction. Although a concession by the State is generally within its prerogative, it does not provide us with the authority to do what we are prohibited from doing under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d). As the Supreme Court has often reminded us, "AEDPA prohibits federal habeas relief for any claim adjudicated on the merits in state court, unless one of the exceptions listed in § 2254(d) obtains." *Premo v. Moore*, 562 U.S. 115, 121 (2011). Because Ellis is unable to show that the state court's denial of his Sixth Amendment claim is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), we simply may not issue the writ. The State, on the other hand, can itself provide Ellis the relief that it now asserts he deserves, as well as pursue in state forums the proposed "new rule of constitutional law" it now seeks. Accordingly, I would affirm the district court's denial of Ellis' petition.

## I.

## A.

On November 24, 1989, around 10:15 p.m., Ellis and Macon approached a car at a McDonald's drive-through window, put a gun to the driver's head, and ordered him out of the car. When the driver, Joel Martinez, turned away in fear, the gunman fired several shots into the car and hit Martinez three times. The gunman opened the door, forced himself into the car while firing more shots toward Martinez, and shot the man in the passenger seat, Jeffrey Amerson. As the gunman put the car in gear and started to drive away, Amerson fell out of the open passenger door, choking on his blood. The gunman then pushed Martinez out through the

passenger door, pointing his pistol at him, and drove away. Amerson died; Martinez survived.

Three days later, Macon voluntarily surrendered to the police. Ellis and Macon were subsequently arrested and eventually tried in San Bernardino County court for one count of special circumstance murder (i.e. murder arising out of a robbery), one count of attempted murder, and two counts of robbery. The prosecution's evidence included the testimony of Martinez and several other eyewitnesses who were able to identify Ellis or Macon in photograph or live lineups, or at least testify that Ellis looked like one of the gunmen. One of these witnesses, Twyla Chambers, was working at the drive-through window at the time of the attack, and recognized Ellis as one of the gunmen because they had gone to school together.

Ellis and Macon were jointly tried five times for their crimes. The first two trials resulted in mistrials due to witness unavailability, and the third and fourth trials resulted in hung juries. The fifth trial resulted in Ellis' and Macon's convictions for first-degree murder, attempted murder with the infliction of great bodily injury, and robbery. Donald S. Ames, now deceased, represented Ellis in the last four of his five trials.

## B.

After trial, Macon filed a motion for a new trial, joined by Ellis, based on a claim of newly discovered evidence. The trial court denied the motion, but the California Court of Appeal remanded for a hearing. Following the remand and further investigation, the trial court again denied the motion for a new trial, and the California Court of Appeal subsequently affirmed Ellis' conviction and sentence. The California Supreme Court also denied without comment

Ellis' petition for review. Ellis did not seek direct review of his appeal with the Supreme Court of the United States, nor did he raise any claims of ineffective assistance by Ames in his post-trial proceedings before the California courts.

In 2003, Ellis learned of accusations that Ames was a virulent racist, primarily based on our decisions in two cases, *Wade v. Calderon*, 29 F.3d 1312 (9th Cir. 1994), and *Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2001), in which we granted habeas relief based on claims of Ames' ineffectiveness. Ellis subsequently obtained declarations from Ames' former secretary, Ames' daughters, and a county fiscal clerk, all of whom attested to incidents in which Ames expressed hateful and offensive epithets against African-Americans and other races and ethnicities.

In light of the newly discovered information about Ames, Ellis filed a state habeas petition with San Bernardino County Superior Court in August 2003. There, Ellis raised an ineffective assistance of counsel claim on the ground that Ames' racism created an actual conflict of interest that adversely affected his performance, which he argued entitled him to relief under *Cuyler v. Sullivan*, 446 U.S. 335 (1980). Ellis did not argue that Ames's racism affected his representation of Ellis in his second, third, or fourth trials. According to Ellis, it was only at the fifth trial, after the trial court replaced Macon's white attorney with an African-American attorney, that Ames was motivated to "sabotage the case in a misguided attempt to punish" the new attorney.

The superior court denied Ellis' petition in a short, reasoned order in November 2003. According to the court,

> The acts which [Ellis] claims demonstrated trial counsel's racial bias were all obvious at the time of trial. There is no showing that

> [Ellis] made any previous complaint during the intervening twelve years . . . [and the fact that a federal appellate court found Ames racially biased in another case] did not demonstrate that the acts of which [Ellis] complains were racially motivated.

The court also concluded that Ellis had not shown prejudice by any or all of the claimed acts and had not "reasonably shown by competent evidence that, absent any or all of the acts, the outcome of the trial would have been more favorable to him," citing to two cases that applied *Strickland v. Washington*, 466 U.S. 668 (1984). It stated in its penultimate sentence, "The proof of this prejudice must be by a preponderance of the evidence," citing *In re Johnson*, 18 Cal. 4th 447 (Cal. 1998).

Ellis subsequently filed habeas petitions raising the same claim with the California Court of Appeal, and then the California Supreme Court, both of which denied his petitions without substantive comment or citation to authority.

## C.

In June 2005, Ellis filed his pro se federal habeas petition in district court, raising four grounds for relief, including his Sixth Amendment claim under *Sullivan*. The district court dismissed the petition in its entirety as time-barred. Ellis appealed, and in March 2008, we affirmed in part, reversed in part, and remanded Ellis' petition to the district court "for consideration of any facts supporting Ellis'[] entitlement to equitable tolling" on his Sixth Amendment claim. *Ellis v. Harrison*, 270 F. App'x 721 (9th Cir. 2008). On remand, the district court again dismissed the entire petition with prejudice, concluding that equitable tolling was not warranted. We again reversed on appeal, determining that

Ellis was entitled to equitable tolling on his ineffective assistance claim based on Ames' racism, and remanded the case for further consideration. *Ellis v. Harrison*, 563 F. App'x 531, 533 (9th Cir. 2014).

After our second remand, the district court ordered supplemental briefing on the merits of Ellis' claim of ineffective assistance based on Ames' racism. Apparently viewing this as an opportunity to provide the court with new evidence, Ellis obtained updated declarations from Ames' daughters and attached them to his reply brief. In one of these updated declarations, Ames' youngest daughter recalled "a specific conversation" with her father

> around 1990 or 1991, during which he described a case in which African-American men were accused of holding up or robbing someone at a fast food restaurant. My father referred to his client in the case with racial slurs. My father also commented on how stupid his client was for committing the crime in the manner he did and said that such stupidity was typical of African-Americans.

The district court construed Ellis' ineffective assistance claim as raising "three sub-grounds" for relief: (a) Ames' racism was an actual conflict of interest under *Sullivan*; (b) Ames' performance was deficient and prejudicial under *Strickland*; and (c) Ames' conflict rose to the level of a presumptively-prejudicial Sixth Amendment violation under *United States v. Cronic*, 466 U.S. 648 (1984). Addressing Ellis' claims under *Sullivan* and *Strickland*, the district court acknowledged the state's argument that both arguments were procedurally barred (because the state court had rejected them as untimely), but proceeded to review and

deny the claims on their merits, concluding that neither claim survived AEDPA's deferential standard.  As to Ellis' claim under *Cronic*, the district court found that it appeared to be unexhausted since Ellis had raised it for the first-time in his reply brief, but nonetheless also proceeded to deny the claim on its merits.  According to the district court, *Cronic* was distinguishable and Ellis' inability to "meet either the [*Sullivan*] or *Strickland* standards" meant "he [could not] meet the *Cronic* standard either."

Ellis appealed again to our court.  In a per curiam opinion, a panel of this court "reluctantly" affirmed the district court and denied relief, stating that "[o]ur precedent [referring to *Mayfield v. Woodward*] involving the same attorney and mostly the same evidence requires us to reject [Ellis'] contention."  *Ellis v. Harrison*, 891 F.3d 1160, 1162 (9th Cir. 2018) (per curiam), *reh'g en banc granted*, 914 F.3d 1188 (9th Cir. 2019).

## D.

At every stage of the post-trial proceedings recounted thus far—from the motion for a new trial and appeal, to the state habeas petitions, to the federal habeas petition and each of the three habeas appeals to our court—the State ably and persuasively defended against Ellis' challenges to his conviction.[1]

---

[1] For instance, in its response brief to Ellis' most recent appeal to this court, the State argued: (1) Ellis' *Sullivan* claim proposed a brand new rule that was unsupported by Supreme Court precedent, and was thereby barred by the nonretroactivity doctrine of *Teague v. Lane*, 489 U.S. 288 (1989); (2) because the state court's denial of Ellis' claim was neither "contrary" to or an "unreasonable application of "clearly established" Supreme Court precedent, Ellis was not entitled to relief

But after the panel denied relief and Ellis filed a petition for rehearing en banc, the State did an about-face. In a stark reversal from its previous position, the State declared in its response to Ellis' petition for en banc rehearing, "The Attorney General agrees that where, as here, the record shows that defense counsel harbored extreme animus toward a defendant's racial group, prejudice should be presumed." The State joined Ellis in asking us to review the case en banc and overrule precedent "to the extent necessary to hold that prejudice will be presumed like the one at issue here." Acknowledging that its requested new rule would normally be barred on collateral review, the State expressly offered to waive the *Teague* bar[2] and any other procedural bars. According to the State, its new position was justified because "it is important that there be no ambiguity about the law's appreciation of, and intolerance for, the insidious effects of the deep-seated racism revealed by the present record."

We took the case en banc and appointed the Criminal Justice Legal Foundation ("CJLF") as amicus curiae to defend the State's former position that the writ should not issue. The San Bernardino County District Attorney—the governmental entity that originally prosecuted Ellis at trial—also filed a separate amicus brief, advocating against the requested relief and the proposed new rule, effectively

---

under AEDPA; and (3) even if this court were to review Ellis' *Sullivan* claim de novo, he would still not be entitled to relief because of his inability to show that Ames committed errors that were likely caused by his racism.

[2] *See Teague v. Lane*, 489 U.S. at 310 (holding that "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced").

opposing the newfound State position as represented by the California Attorney General.

At en banc oral argument, Ellis and the State shared time advocating for a novel rule, while also conceding that Ellis' Sixth Amendment claim would lose under the *Strickland* or *Sullivan* standards.**[3]**  When asked whether, given the State's newfound agreement with Ellis' position, there was still a case or controversy before us, the State provided little response.  When asked why it could not resort to measures under its own broad executive authority to resolve Ellis' petition, or why it did not first seek relief with the California courts instead of ours, the State simply reiterated its position that we should issue the new rule because of its paramount importance to addressing the insidious effects of racism in the criminal justice system.

II.

A concession by the State in a criminal action is generally well within its prosecutorial discretion, and sometimes even necessary in its pursuit of "justice within the bounds of the law."  Criminal Justice Standards for the Prosecution Function § 3-1.1 (Am. Bar Ass'n 2015).  But decisions to concede a criminal conviction by the State should not be taken lightly, particularly when the concession could result in the reversal of a conviction that was fairly sought, obtained, defended, and previously affirmed.  *See id*. § 3-8.1 ("The prosecutor has a duty to defend convictions obtained after fair process.").  That is because the State, in its prosecutorial function, serves the public interest.  This includes not only concerns for the defendant, but also for the

---

**[3]** Ellis conceded only that he would lose under *Strickland*, while the State argued that he would lose under both *Strickland* and *Sullivan.*

victims and the community that the prosecutor is charged to represent—as guided by the laws and constitutional mandates he has sworn to uphold.**[4]** In balancing these many interests within our adversarial system of justice, the prosecutor must be both "a zealous advocate . . . who must aggressively seek convictions in court on behalf of a victimized public" and "a representative of the state" who "place[s] foremost in his hierarchy of interests the determination of truth." *United States v. Bagley*, 473 U.S. 667, 696 (1985).

When the State took Ellis' case to trial, it presumably did so as part of its duty to "protect the innocent and convict the guilty," and in pursuit of justice for those who were wronged by Ellis' crimes. Criminal Justice Standards for the Prosecution Function § 3-8.1. When the State chose to defend Ellis' conviction every time it was challenged on direct or collateral review, the State presumably did so because the conviction had been fairly obtained, and because defending the conviction served the interest of "justice within the bounds of the law." *Id*. § 3-8.1. Presumably then, an abandonment of that defense leaves unprotected the just interests that the State once served. Accordingly, the State's concession to Ellis' federal habeas petition should have been an extraordinary act requiring great justification.

So, what was the justification for the State's decision to lay down its defense of Ellis' conviction and join his cause at this late stage of federal habeas review? What happened—in the short time between the three-judge panel's

---

**[4]** In California, "the Attorney General shall be the chief law officer of the State" and is constitutionally charged with "the duty . . . to see that the laws of the State are uniformly and adequately enforced." CAL. CONST. art. V, § 13.

denial of the writ and Ellis' request for rehearing en banc—
that moved the scales of justice to weigh in favor of
overturning Ellis' conviction?  Did the law change in some
significant way, or did newly discovered facts come to light,
so as to warrant Ellis federal habeas relief?  Apparently not.
Rather, according to the State, it changed its mind after
further reflection because "questions of racial discrimination
in the administration of justice are of unique importance"
and "[t]here should be no ambiguity about the law's
recognition of, and intolerance for, the insidious effects of
the sort of deep-seated racism revealed by the record" in this
case.

The cause underlying the State's change in stance is
certainly a noble one.  The effects of racial prejudice in our
criminal justice system is a serious and undeniable issue.  As
the Supreme Court has recently stated, "The Nation must
continue to make strides to overcome race-based
discrimination."  *Pena-Rodriguez v. Colorado*, 137 S. Ct.
855, 871 (2017).  But ultimately a federal habeas action is
not the proper vehicle for policymaking or advocacy of a
cause—no matter how worthy—that is unmoored from the
legal grounds for the issuance of a writ.

In reviewing Ellis' habeas petition, the task before us is
not to eradicate every vestige of racism in the criminal
justice system, as important as that goal may be.  Rather, our
inquiry is limited to deciding whether Ellis' Sixth
Amendment rights were violated by Ames' representation at
trial.  Moreover, we must consider this question within the
constitutional and statutory bounds that cabin and guide our
authority.  Because Ellis seeks a federal writ of habeas
corpus as "a person in custody pursuant to the judgment of a
State court," 28 U.S.C. § 2254(d), we may not grant the writ
unless Ellis is able to overcome AEDPA's "difficult to meet

. . . and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted). Under that standard, a federal court "shall not" grant habeas relief on Ellis' claim unless the state court's ruling "resulted in a decision that was contrary to, or involved an unreasonable application of," Supreme Court law that was "clearly established" at the time the state court adjudicated the claim on the merits. 28 U.S.C. § 2254(d)(1).[5] Furthermore, while the State may waive the *Teague* bar and other affirmative defenses in this case, it cannot waive this deferential standard of review mandated by Congress. *See Amado v. Gonzalez*, 758 F.3d 1119, 1133 n.9 (9th Cir. 2014) ("[W]e have the obligation to apply the correct standard

---

[5] Judge Watford contends that 28 U.S.C. § 2254(d) "does not apply here because the claim on which the court grants relief was never adjudicated on the merits in state court." But the habeas claim before us is, in fact, the same claim that was adjudicated in state court: that Ellis' Sixth Amendment right to effective assistance of counsel was violated due to Ames' racism. In analyzing Ellis' claim, the district court identified three potential "sub-grounds" for relief under *Strickland*, *Sullivan*, and *Cronic*. This, however, does not mean that Ellis' claim—which invokes a single "federal constitutional guarantee" based on a singular set of facts—can now be parsed into three distinct claims based on each of the judicially-created tests that might apply to claims of ineffective assistance. *See Gray v. Netherland*, 518 U.S. 152, 162–63 (1996) ("[A] claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief."). Deconstructing Ellis' claim in this way not only misconstrues the meaning of a "claim adjudicated on the merits" in state court, but circumvents Congress' intent in establishing § 2254(d). *See Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004) ("[A] state has 'adjudicated' a petitioner's constitutional claim 'on the merits' for purposes of § 2254(d) when it has decided the petitioner's right to post conviction relief on the basis of the substance of the constitutional claim advanced . . . .").

[under AEDPA], for the issue is non-waivable."); *Hernandez v. Holland*, 750 F.3d 843, 856 (9th Cir. 2014) ("[E]ven if the Warden by silence conceded that AEDPA does not bar issuance of the writ, such concession cannot bind us.").

Whereas our ability to grant Ellis a federal writ of habeas corpus is subject to these substantial constraints, the State's authority to provide Ellis with relief as it deems appropriate is not. Yet the State still asks us to issue the writ, while admitting that we would need to create a new rule of constitutional law to do so—potentially in excess of our legal authority. The implications of the State's late-hour reversal are troubling, to the say the least. Not only does it leave Ellis' conviction undefended, but it raises significant mootness concerns and places our court in an untenable position for resolving this petition and the serious constitutional question raised.**[6]**

---

**[6]** The State's position also effectively bars any further review by the Supreme Court, while potentially resulting in Ellis' release from custody. The victims, witnesses, and their families may be forced, three decades later, to endure the "spectacle" of a sixth criminal trial and all that it entails. *See Morris v. Slappy*, 461 U.S. 1, 14 (1983) ("In its haste to create a novel Sixth Amendment right, the court wholly failed to take into account the interest of the victim of these crimes in not undergoing the ordeal of yet a third trial in this case. . . . The spectacle of repeated trials to establish the truth about a single criminal episode inevitably places burdens on the system in terms of witnesses, records, and fading memories, to say nothing of misusing judicial resources."). Or perhaps worse, because the murder occurred nearly thirty years ago, Ellis might not be retried at all. On the other hand, Ellis' co-defendant, Macon, who underwent the same five trials for the same crimes, but was not represented by Ames, presumably remains in prison for life without the possibility of parole.

The majority eludes these issues by simply directing the district court to grant the writ on the basis of the State's concession. But the State's abdication of its defense of Ellis' conviction does not relieve us of the duty to decide whether, under AEDPA, Ellis is entitled to relief on his Sixth Amendment claim. Moreover, the majority's lack of reasoning for its issuance of the writ cannot disguise the fact that our order is contrary to AEDPA—even if it is what the State asks us to do. Indeed, I agree with Judge Nguyen that we have an obligation to reach the merits of Ellis' Sixth Amendment claim. And while I applaud the valiant attempt in her concurrence to reconcile the court's summary disposition with its statutory responsibilities, I must disagree with her conclusion that Ellis is entitled to federal habeas relief.

## III.

Under AEDPA, we may grant Ellis relief only if we find that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state court's decision is "contrary to" clearly established federal law if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). A state court's decision is an "unreasonable application" of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407–08. If no Supreme Court precedent "creates clearly established federal law relating to the legal issue the habeas petitioner

raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485–86 (9th Cir. 2000)).

"The threshold question under AEDPA is whether [Ellis] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams*, 529 U.S. at 390. Ellis originally sought relief for his claim of ineffective assistance under the Supreme Court's *Sullivan* rule, but the Supreme Court has never applied *Sullivan* to a claim like Ellis', or squarely addressed such a claim whatsoever. However, the Supreme Court "has repeatedly applied [*Strickland*] to evaluate ineffective-assistance-of-counsel claims where there is no other Supreme Court precedent directly on point." *Knowles v. Mirzayance*, 556 U.S. 111, 122–23 (2009). Under *Strickland*, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." 466 U.S. at 691. Although the Supreme Court has recognized exceptions to this general requirement of prejudice—for instance, a presumption of prejudice for "denial of counsel" claims under *Cronic*, or a partial presumption of prejudice for "conflict of interest" claims under *Sullivan*—it has never extended these exceptions to claims like Ellis' based on the trial counsel's racism.

Under "clearly established" Supreme Court law then, Ellis' claim should be governed by the general rule of *Strickland*, which "'provides sufficient guidance for resolving virtually all' claims of ineffective assistance, even though their particular circumstances will differ." *Chaidez v. United States*, 568 U.S. 342, 348 (2013) (quoting *Williams*, 529 U.S. at 391). Here, the last-reasoned state

court decision denied Ellis' ineffective assistance claim, in part, on the ground that Ellis was unable to demonstrate that he was prejudiced by any act of Ames. In doing so, the state court declined to apply *Sullivan*'s partial presumption of prejudice, as Ellis advocated, in favor of *Strickland*'s general prejudice requirement. As Judge Nguyen correctly recognizes, this choice of *Strickland* over *Sullivan* as the governing rule for Ellis' claim "was not an unreasonable application of the Supreme Court's Sixth Amendment jurisprudence." *See Knowles*, 556 U.S. at 122 ("[I]t is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."). Nor was the state court decision "contrary to" clearly established federal law. Because there is no Supreme Court case to "confront 'the specific question presented by this case,' the state court's decision could not be 'contrary to' any holding from [the Supreme] Court." *Woods v. Donald*, 135 S. Ct. 1372, 1377 (2015) (per curiam) (citation omitted).

While our AEDPA analysis should generally end there, Judge Nguyen asserts that the "state court decision was nonetheless contrary to clearly established federal law because it required Ellis to show prejudice by a preponderance of the evidence." She therefore opines that we may review Ellis' claim de novo and adopt a novel presumption of prejudice, as the parties propose.

Such rationale raises several concerns. While the "preponderance of the evidence" standard is evidently a departure from the prejudice standard set forth in *Strickland*,[7] I question whether this singular misstatement of

---

[7] To establish prejudice under *Strickland*, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors,

the law is sufficient to render the entire state court decision to deny Ellis habeas relief "contrary to" clearly established Supreme Court law.  For one, the superior court's short but faulty statement (that "[t]he proof of this prejudice must be by a preponderance of the evidence") followed a substantive analysis and conclusion that otherwise appears to comport with a reasonable application of *Strickland*.

Second, Judge Nguyen's conclusion is premised on the assumption that both the California Supreme Court and the California Court of Appeal also relied on a "preponderance of the evidence" standard, instead of applying the correct *Strickland* standard, when they each summarily denied Ellis' Sixth Amendment habeas claim.  Although we generally "look through" unexplained orders "to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning," this "look through" presumption is "not an absolute rule."  *Wilson v. Sellers*, 138 S. Ct. 1188, 1196 (2018).  "[T]he unreasonableness of the lower court's decision itself provides some evidence that makes it less likely the state supreme court adopted the same reasoning." *Id*.  Given the superior court's obvious mischaracterization of the applicable burden for showing prejudice in claims of ineffective assistance of counsel, I have serious misgivings that the higher state courts adopted such an error instead of the well-established and routinely-applied *Strickland* standard in denying Ellis' claim.

Third, to presume prejudice on Ellis' claim, as Judge Nguyen and the parties propose, we would either need to create a new rule or "transpose" the presumption of

---

the result of the proceedings would have been different."   466 U.S. at 694.

prejudice established in *Cronic* to the "novel context" that Ellis' case presents. *Premo*, 562 U.S. at 127. But, as the Supreme Court has corrected us on more than one occasion, such "transposition is improper" under AEDPA review, and "novelty alone—at least insofar as it renders the relevant rule less than 'clearly established'—provides a reason to reject [a claim] under AEDPA." *Id.* at 127–28; *see also Lopez*, 574 U.S. at 4 ("We have before cautioned the lower courts— and the Ninth Circuit in particular—against 'framing our precedents at such a high level of generality.' None of our decisions that the Ninth Circuit cited addresses, even remotely, the specific question presented by this case." (citation omitted)). Indeed, the Supreme Court has several times now reversed a "*Cronic*-based grant of habeas relief" precisely because the Court "ha[d] never addressed whether the rule announced in *Cronic* applie[d]" in the circumstances presented. *Woods*, 135 S. Ct. at 1377; *see also Wright v. Van Patten,* 552 U.S. 120, 125 (2008) ("No decision of this Court . . . squarely addresses the issue in this case . . . or clearly establishes that *Cronic* should replace *Strickland* in this novel factual context." (citations omitted)).

Even assuming that the state court decision was "contrary to" clearly established federal law because it "applie[d] a rule that contradicts the governing law," *Williams*, 529 U.S. at 405, we still may not simply disregard *Strickland* entirely in favor of adopting a new rule. In fact, Judge Nguyen's conclusion that the state court "applie[d] a rule that contradicts the governing law"—by applying a prejudice standard that contradicted the one set forth in *Strickland*—is premised on the assumption that *Strickland* indeed provides "the governing law" to Ellis' claim. Accordingly, a de novo review of Ellis' ineffective assistance claim still requires adherence to the Supreme Court's Sixth Amendment jurisprudence, wherein

*Strickland* provides the general governing framework for ineffective assistance of counsel claims. Of course, reviewing Ellis' claim de novo under the *Strickland* rule does not help Ellis much, as the parties fully agree that Ellis is unable to demonstrate that he suffered any prejudice from Ames' alleged ineffectiveness. Thus, even if the state court's error frees us to independently view Ellis' claim, he still has not shown a violation of his Sixth Amendment right.

## IV.

The abhorrently racist statements of Ames, as evidenced by the record, makes this a difficult case. Ames was an offensive and abusive human being, even by the accounts of those who knew him best. To any extent that Ames' racism rendered his representation of Ellis at trial prejudicially deficient, we certainly have an obligation under the Sixth Amendment to correct it. But where, as here, a habeas petitioner fails to show that his trial counsel's racist beliefs adversely affected his performance at trial, as required under *Sullivan*—much less that it created a reasonable probability of a different result, as required under *Strickland*—we are bound under AEDPA and the Sixth Amendment to deny Ellis' request for habeas relief.

In sum, Ellis is not entitled to relief under our current governing Sixth Amendment framework, and certainly not under AEDPA's deferential standard of review, which limits our authority to grant habeas relief to a state prisoner. That the State has conceded its defense of Ellis' conviction does not change the fact that we may not grant Ellis a writ of habeas corpus unless he meets the requirements of AEDPA. In contrast to our limitations, the State has remedies both within its executive power and in the state courts to provide Ellis with such relief as it deems appropriate. The State should act on the strength of its convictions rather than ask

us to exceed our legal authority by adopting a new constitutional rule.

I respectfully dissent.