# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 54284-6-II |
| Respondent, | |
| v. | |
| ADRIAN ALVAREZ, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, A.C.J.—Jayden Montgomery-Fisher, Joshua Soria, and Adrian Alvarez drove up next to another car occupied by Robert Doss II and Auzhane Evans one night in 2018. The person in the back seat of Montgomery-Fisher's car fired shots killing Doss and injuring Evans. All three men in Montgomery-Fisher's car were charged with murder.

Montgomery-Fisher and Soria pleaded guilty and testified for the State at Alvarez's trial. They said that Alvarez shot Doss and Evans from the back seat. Evans testified that the shooter was wearing a hooded sweatshirt and was in the back seat. A jury convicted Alvarez of first degree murder for killing Doss, first degree attempted murder for injuring Evans, and drive-by shooting.

Alvarez first asserts that his counsel made a racially derogatory remark directed at him, and the trial court abused its discretion by denying him substitute counsel. Alvarez also contends that defense counsel should have sought, and the trial court should have given the jury, a cautionary instruction regarding accomplice testimony. He argues the to convict jury instructions lacked an essential element, the prosecutor committed misconduct, his drive-by shooting conviction violated double jeopardy, and the trial court erred by not considering Alvarez's youth at sentencing. Alvarez

further argues, and the State concedes, that the trial court improperly failed to enter written findings of fact to support an exceptional sentence and two legal financial obligations (LFOs) should be stricken. Finally, Alvarez filed a statement of additional grounds for review (SAG).

We affirm Alvarez's convictions. We remand for the trial court to enter written findings to support Alvarez's exceptional sentence upward, strike the community custody supervision fee from his judgment and sentence, and investigate the DNA collection fee. We otherwise affirm Alvarez's sentence. Alvarez is not entitled to resentencing at this time.

FACTS

I. BACKGROUND

Doss shot Arnelle Anderson, a member of a rival gang, in May 2018. Anderson survived the shooting, but he did not seek police assistance or cooperate with law enforcement, and Doss was never prosecuted.

Montgomery-Fisher, Soria, and Alvarez were in the same gang as Anderson. Two months later, the three men were driving around Tacoma. Montgomery-Fisher was in the driver's seat, Soria was in the front passenger seat, and Alvarez was in the back seat. They stopped their car to ask two men in a 7-Eleven and a pedestrian about their gang affiliation. Both encounters ended peacefully.

Then the three men pulled up alongside a car with Doss in the passenger seat and Evans in the driver's seat. Montgomery-Fisher asked Doss where he was from. Doss replied by identifying his gang. Montgomery-Fisher drove his vehicle forward as the back window rolled down, and several shots were fired from the rear passenger window into Evans's car. The shots killed Doss and wounded Evans's hand.

2

Detective Steven Shank was the lead investigator on the shooting. Between Evans's recollections and security camera footage from businesses in the area, police traced the vehicle to Montgomery-Fisher. When interviewed, Montgomery-Fisher admitted that he, Soria, and Alvarez had been seeking to attack rival gang members as revenge for Anderson, and they stumbled across Doss as a coincidence.

Montgomery-Fisher and Soria both pleaded guilty. In exchange for their testimony at Alvarez's trial identifying Alvarez as the shooter, the State agreed to recommend for Montgomery-Fisher a sentence of 16.5 years instead of more than 50 years, and for Soria a sentence of 32.5 years instead of life.

Alvarez was charged with both premeditated and extreme indifference first degree murder and second degree murder for killing Doss. He was also charged with first degree attempted murder and first degree assault for wounding Evans, drive-by shooting, and first degree unlawful possession of a firearm. All of the charges except the drive-by shooting and unlawful possession of a firearm carried firearm enhancements, and every charge except the firearm possession carried a gang aggravator.

## II. PRETRIAL

A.      Motion for Substitution of Counsel

In July 2019, Alvarez filed a bar complaint against his attorney and sought to have him replaced with new counsel. When the trial court asked Alvarez "what do you want me to know?" Alvarez stated,

> I would like to have [my attorney] withdraw from my case due to his derogatory
> terms that he used against me, calling me a wetback, and that I should rot in prison
> with the rest of my kind.

I would like him to withdraw from my case. We have a communication meltdown. We never been on the same page.

Verbatim Report of Proceedings (VRP) (July 1, 2019) at 12. The trial court asked if the attorney

wished to respond, and counsel denied making such comments:

I did not make those statements, Your Honor. The only thing close I would say was when I asked him about where he was born, if he was a [U.S.] citizen, as I do on every case. And probably [I] would then make a few remarks about saying I only ask this because I need to know if you are because [it] can [a]ffect your . . . case . . . which is one of the first things you're supposed to do.

But we've never had any remarks -- I never said anything like that.

*Id.* at 13. The judge noted that the attorney had been appearing in front of her for 20 years and that

the comments did not "sound to me like something I've ever heard [him] do, and he's an excellent

lawyer." *Id.* Alvarez stated, "He can be one way towards you but in another time -- like, when we

. . . are face to face, he can be a different person. So people can put a different persona on for

different people so you don't know if he said that to me or not." *Id.* at 14. The trial court explained

that Alvarez had not presented a sufficient legal basis to discharge his attorney, especially where

the case was already 300 days old. The trial court denied Alvarez's request.

B.      Motions Regarding Impeachment of Accomplices

Defense counsel sought permission to impeach Montgomery-Fisher and Soria by asking

them about their plea deals and the potential reduction in the State's recommended sentences,

including that Soria was facing a possible life sentence because he was on his third strike offense.

The State agreed that defense counsel could ask them about the total number of years that they

were facing, contrasted with the deal they would receive for testifying for the State in Alvarez's

case. But the State opposed mentioning Soria's third strike because discussing prior strikes would

4

reveal criminal history to the jury, information that would normally be excluded. The trial court ruled that in addition to facing a life sentence, defense counsel could say that Soria was avoiding a strike offense by pleading guilty, but not that he was avoiding his *third* strike. The trial court stated, "I don't think it's relevant that he had two other strike offenses prior to that." 5 VRP at 495.

Defense counsel also sought permission to impeach Montgomery-Fisher with several juvenile convictions—a third degree theft from 2014, another third degree theft and a false statement to a public servant from 2012, and two third degree thefts from 2010. The trial court allowed defense counsel to raise the 2014 theft and the 2012 false statement and theft. The trial court stated that it would allow those convictions to be raised because they were "recent in history" and "necessary for a fair determination of the issues of guilt or innocence in light of [the] seriousness of the charges." 9 VRP at 1171. "I think the rest of the thefts are cumulative . . . [b]ut the false statement I think is also germane." *Id.* at 1171-72.

Defense counsel also requested permission to impeach Soria with a third degree theft from 2010, a possession of a stolen vehicle from 2009, and a second degree robbery from 2008. The trial court stated, "You can use the 2010 theft in the third. The others are too remote." 10 VRP at 1434.

### III. TRIAL

A.    Testimony and Closing Argument

At trial, witnesses testified that Alvarez and Montgomery-Fisher both lived on property in Graham around the time of the shooting. On the night of the shooting, Alvarez, Montgomery-Fisher, and Soria left the Graham property to purchase cigarettes and marijuana. They left in Montgomery-Fisher's white Kia Sorento, the vehicle used in the shooting. They were gone for

several hours. Montgomery-Fisher's then-girlfriend became concerned about the length of time and began calling Soria and Montgomery-Fisher repeatedly. They told her that the car had overheated and they had stopped to put water in the engine.

The State sought to establish the route the men took in the white Kia the night of the shooting. Data from Soria's mobile phone indicated that he had been near a 7-Eleven around 10:30 p.m., close to the location of the shooting at 10:48 p.m., and near a McDonalds at 11:18 p.m.

Footage from the 7-Eleven showed Montgomery-Fisher, Soria, and Alvarez enter the store at approximately 10:32 p.m. In the video, Montgomery-Fisher, the only white member of the group, was wearing a black shirt; Soria was wearing a white shirt; and Alvarez was wearing a black hooded sweatshirt. Montgomery-Fisher approached two men within the 7-Eleven, asked for their gang affiliation, and left after receiving their answer. The white Kia left the 7-Eleven parking lot at roughly 10:34 p.m. After leaving the 7-Eleven, the men approached a pedestrian on the side of the road to ask where he was from. The pedestrian answered that he was from California, so the men left him alone. The first 911 call reporting the shooting was placed at approximately 10:50 p.m. The State presented a Google Maps estimate that the travel time from the 7-Eleven to the site of the shooting was 12 to 13 minutes.

Evans testified that the shots came from the rear window of the vehicle that pulled up next to her car and that she had told police the shooter was wearing a black hood. On cross-examination, Evans conceded that she had given varying accounts of what she could and could not remember in the days and months after the shooting. Evans testified that although she struggled with the details, she had never placed the shooter anywhere besides the back seat, and she had consistently believed that the shooter had dark skin and wore a black hood.

6

After the shooting, the white Kia traveled to a McDonalds where Montgomery-Fisher worked, arriving at roughly 11:17 p.m. The State played surveillance footage of Montgomery-Fisher entering the McDonalds alone to collect cups for water and use the restroom.

When the three men returned to the property in Graham in the white Kia, Montgomery-Fisher, who had shoulder-length hair, shaved his head. A visitor observed Alvarez trying to melt pieces of a gun in a fire pit on the Graham property after the shooting. Police did not recover the firearm used in the shooting, but the trial court admitted as evidence several pieces of metal that were collected from the fire pit that came from the same type of firearm as the one used in the shooting. And the State presented evidence that a magazine containing the same caliber of rounds fired at Doss and Evans was found under the mattress in the room where Alvarez lived.

The State called Johan Schoeman, a forensic scientist, to testify that shell casings recovered from the scene of the shooting and shell casings collected from a barn on the Graham property had been fired from the same gun. And Shank testified that, had someone fired a gun from the driver's seat of a vehicle out of the rear passenger window, the casings would likely have landed inside the vehicle instead of outside.

The State played recorded jail phone calls from Alvarez to Anderson where Alvarez complained that he "slid" for Anderson without Anderson doing anything to repay him. 11 VRP at 1626. Shank testified that "slide" can "mean to pull up on someone to press an issue, fight or shoot them." *Id.* at 1626-27.

Montgomery-Fisher and Soria testified for the State. The two blamed each other regarding whose idea it was to seek revenge for Anderson, but both testified that Alvarez shot Doss.

7

Montgomery-Fisher testified on direct examination that he had already pleaded guilty to first degree murder and several other charges, resulting in a possible sentence of over 50 years. He admitted that in exchange for testifying in Alvarez's trial, the State would recommend a sentence of 16 years.

On cross-examination, Montgomery-Fisher acknowledged that he had been convicted for giving a false statement to a public servant in 2012 and third degree theft in 2014. Montgomery-Fisher also conceded that he lied to the police throughout their investigation of the shooting. On redirect, the State sought to rehabilitate Montgomery-Fisher's credibility:

> [PROSECUTOR:] [Montgomery-Fisher] this morning before you testified, we sat out in the hall, correct?
>
> [MONTGOMERY-FISHER:] Yes.
>
> . . . .
>
> [PROSECUTOR:] What did I tell you to do?
>
> [MONTGOMERY-FISHER:] Be honest.
>
> [PROSECUTOR:] Do you remember me telling you I don't know your truth?
>
> [MONTGOMERY-FISHER:] Yes.
>
> [PROSECUTOR:] I wasn't there. I don't know what happened?
>
> [MONTGOMERY-FISHER:] Yes.
>
> [DEFENSE COUNSEL:] Objection, your Honor. Counsel is testifying.
>
> THE COURT: I'll allow some discretion.
>
> . . . .
>
> [PROSECUTOR:] What did I emphasize you do?

8

[MONTGOMERY-FISHER:] Tell the truth.

[PROSECUTOR:] If the truth is that you shot a gun that night, I want you to tell it. Did you shoot a gun?

[MONTGOMERY-FISHER:] No, I did not shoot the gun.

9 VRP at 1309-10. Defense counsel did not further cross-examine Montgomery-Fisher on this issue.

Defense counsel used cross-examination of Soria to impeach Montgomery-Fisher further with testimony that he had a reputation as a "storyteller." 10 VRP at 1512. Soria corroborated Montgomery-Fisher's timeline of the evening and that Alvarez fired the gun. On cross-examination, defense counsel raised Soria's plea deal and the reduction in his sentence from something "like life" to 32 years, due to his cooperation with the State. *Id.* at 1508. He also emphasized that the State had to "be happy" with Soria's testimony for Soria to receive the benefit of the deal. *Id.* at 1509. Defense counsel then raised Soria's 2010 theft conviction.

In closing, the State recited pieces of Evans's testimony and then identified evidence that corroborated her account, frequently using surveillance footage that had been admitted as evidence. The State argued,

[PROSECUTOR:] [Evans], however short her line of sight or however short her time was during this event in watching that car, she was close enough to see what happened. This car was no more than you all are to me. She was capable of seeing who was in the front seat, where the gun is coming from, where the shooter is coming from. She is capable of seeing that that driver isn't leaning in a sort of bizarre, Gumby-like fashion during the shooting. This woman can be trusted when she says these things.

[DEFENSE COUNSEL:] Objection, your Honor; vouching.

THE COURT: Again, you're to decide the credibility of each witness.

> [PROSECUTOR:] So again, if these facts are true, how do we know the defendant is the shooter? First, we know what each of the men in the car were wearing. We know that [Montgomery-Fisher] had on a black T-shirt, not a hood. Here's him roughly 16 minutes before the shooting, black T-shirt. Here's him after the shooting, black T-shirt, no hood.

12 VRP at 1767-68. The State also pointed out that its case did not rest solely on Montgomery-Fisher and Soria's credibility:

> [PROSECUTOR:] It's important that you all understand that this case does not rise or fall with [Montgomery-Fisher's and Soria's] testimony. This evidence independent of them all points to the defendant.
>
> . . . .
>
> [Montgomery-Fisher] [is not] some mastermind. He's not a terribly intelligent guy. You can kind of understand how he fell in with gangs, that he had some sense of belonging with them or he felt cool or got some attention from it. But this idea that somehow [Montgomery-Fisher] is the ringleader in all of this is just fantastic.
>
> It doesn't mean that [Montgomery-Fisher] wasn't an agitator that night. I'm sure he was. But he's not the person on the stand who's lying when he tells you who the real shooter was.
>
> [DEFENSE COUNSEL:] Objection; vouching, your Honor.
>
> THE COURT: Just opinion.

You may proceed.

> [PROSECUTOR:] I want to be clear. I'm not giving you my personal opinion. I'm giving you an opinion of what the evidence represents and what you should conclude the evidence represents.

12 VRP at 1777-80.

Defense counsel espoused a theory throughout Alvarez's trial that Montgomery-Fisher was the true shooter. Defense counsel focused on the lack of DNA or fingerprint evidence on the shell casings recovered from the scene, the lack of a visible gun on Alvarez's person in the 7-Eleven

10

video, Montgomery-Fisher's reputation for dishonesty, Montgomery-Fisher's shaving of his head, comments Montgomery-Fisher made after his arrest, and Soria's testimony that he did not observe which of the vehicle's other two occupants fired the weapon.

B.      Jury Instructions

While conferencing the instructions, the State raised the issue of limiting the jury to the definition of "premeditated murder" in their evaluation of the attempted murder charge because "attempted extreme indifference murder" is not a possible crime. 11 VRP at 1682. Instruction 9 defined "premeditated murder" for the jury: "A person commits the crime of murder in the first degree when, with a premeditated intent to cause the death of another person, he causes the death of such person or of a third person." Clerk's Papers (CP) at 89. Instruction 19 defined "extreme indifference murder" as "[a] person commits the crime of murder in the first degree when, under circumstances manifesting an extreme indifference to human life, he engages in conduct which creates a grave risk of death to any person and thereby causes the death of a person." CP at 99. Instruction 31 defined "attempted first degree murder" as:

> A person commits the crime of attempted murder in the first degree when, with intent to commit that crime, he does any act that is a substantial step toward the commission of that crime.
>
> For the purpose of this charge, Count IV, the alleged victim is Auzhane Evans.
>
> For the purpose of this charge, murder in the first degree is defined in Instruction Number 9. For the purpose of this charge, you may not consider murder in the first degree as it is defined in Instruction Number 19.

11

CP at 111. Defense counsel did not object to the State's desire to limit the jury to the "premeditated murder" definition when considering attempted murder, and defense counsel made no objection to instruction 31.

Instruction 33 informed the jury that, to convict Alvarez of attempted first degree murder, the jury had to find beyond a reasonable doubt "[t]hat on or about July 18, 2018, the defendant or an accomplice did an act that was a substantial step toward the commission of murder in the first degree;" "[t]hat the act was done with the intent to commit murder in the first degree;" and that the act occurred within Washington. CP at 113.

IV. VERDICT AND SENTENCING

The jury convicted Alvarez of first degree murder of Doss under both the premeditation and extreme indifference theories, second degree murder of Doss, first degree attempted murder of Evans, and first degree assault of Evans, all with firearm sentencing enhancements and gang motivation aggravators. He was also convicted of drive-by shooting with a gang motivation aggravator. The jury acquitted him of unlawful possession of a firearm. The trial court then dismissed the convictions for extreme indifference first degree murder, second degree murder, and first degree assault based on merger.

The standard range for the first degree murder was 240 to 320 months. The standard range for the first degree attempted murder was 195.75 to 260.25 months. The standard range for the drive-by shooting was 36 to 48 months. The murder and attempted murder convictions also carried 60-month firearm sentencing enhancements. Because the murder and attempted murder were serious violent offenses, the trial court had to run their sentences consecutively to each other.

The State requested an exceptional upward sentence of 440 months for the murder due to the gang aggravator and the top of the standard range (260.25 months) for the attempted murder, for a total sentencing recommendation of 820.25 months after the firearm enhancements. Defense counsel requested an exceptional downward sentence, seeking 240 months for the murder before the firearm enhancement and asking the trial court to sentence the attempted murder as a first degree assault, which would have a standard range of 111 to 147 months. The total sentence would be 471 months.

Defense counsel highlighted that the attempted murder charge was for the assault on Evans, who had only been struck in the finger. Defense counsel sought to minimize the gang motivation finding, noting that it was an aggravating circumstance and not a mandatory sentencing enhancement. And defense counsel emphasized that Alvarez "was 22 barely when this thing occurred." 14 VRP at 1883. Counsel raised the latest developments in brain science that established "young males especially do not particularly develop completely until their mid-20s." *Id.* at 1884.

In rebuttal, the State pointed out that Alvarez had been found guilty of first degree assault *and* attempted murder against Evans. The State emphasized that the trial court did not have discretion to impose an exceptional downward departure under *State v. Houston-Sconiers*[1] because Alvarez committed his crimes as an adult. The State asserted that the only possible grounds for a downward departure would have been RCW 9.94A.535(1)(e), which applied if "'the defendant's capacity to appreciate the wrongfulness of [their] conduct or to conform [their] conduct to the

---

[1] 188 Wn.2d 1, 391 P.3d 409 (2017).

requirements of the law was significantly impaired.'" *Id.* at 1889. "Mr. Alvarez was grown up enough to understand what he was doing that night and was able to not get in the car that night, was able to not get involved with what happened that night. And I don't think (1)(e) would apply here." *Id.* at 1889-90. In response, defense counsel asserted the RCW 9.94A.535(1) list of mitigating factors "is not exclusive. The Court can come up with any other particular reason if it found that [youth] actually was a basis." *Id.* at 1890. Defense counsel again urged the trial court to consider Alvarez's youth.

Alvarez addressed the court directly, stating that he was "not fully there develop[mental]ly . . . I was always getting kicked out [of school], always getting in trouble, leaving my mom's house going out to the streets. That's all I knew." *Id.* at 1892.

The trial judge acknowledged the Supreme Court's decision in *Houston-Sconiers*, but noted the distinctions from Alvarez's case and emphasized the gang's influence:

> [*Houston-Sconiers*] set some new law into motion, and a lot of folks now are utilizing that in terms of arguing that young people aren't fully mature and in a way aren't mature enough to understand the consequences of their act.
>
> But in this particular case, they had a lot of time to go back and think about it. And they didn't. They were on a mission, and they, in their minds, accomplished that mission. And that was to seek revenge for their gang against another individual. And that is simply unacceptable in our society. That is what I like to call cave man behavior in the sense that it doesn't respect life, it has no value to it, and your loyalty is to -- is to something else that isn't worth the loyalty. And that's their gang.
>
> So I don't find that there's any reason to [give] an exceptional sentence downward, because I don't feel that any of the facts that applied in *Houston-Sconiers* apply here. I think this was thought of, premeditated, and was an execution.

*Id.* at 1895-96.

14

No. 54284-6-II

The trial court imposed an exceptional sentence above the standard range of 332 months for the murder and 272 months for the attempted murder, to be served consecutively, each with 60-month consecutive firearm enhancements. The trial court also ordered a sentence of 48 months for the drive-by shooting to be served concurrently with the other two charges. The total confinement ordered was 724 months. The record contains no written findings of fact to support the exceptional sentence.

The State did not ask the trial court to impose any LFOs except the mandatory crime victim penalty assessment and DNA collection fee. The trial court seemed to state that it intended to waive all LFOs except for the crime victim penalty assessment. The judgment and sentence included the mandatory $500 crime victim assessment, the $100 DNA collection fee, and $6,435 in restitution. The judgment and sentence did not expressly state that the trial court found Alvarez indigent, although the $200 criminal filing fee was crossed out, and the trial court entered an order of indigency. The judgment and sentence also included boilerplate language requiring Alvarez to pay community custody supervision fees as determined by the Department of Corrections. Alvarez appeals his convictions and sentence.

ANALYSIS

I. REQUEST FOR NEW COUNSEL

Alvarez argues that this court should remand for a new trial because the trial court denied him the right to conflict-free counsel when it refused to assign him a new lawyer after Alvarez reported that his counsel made racially derogatory comments to him. Alvarez argues that the trial court should have questioned both him and his lawyer "'privately and in depth.'" Br. of Appellant

15

at 19 (quoting *United States v. Trung Tran Nguyen*, 262 F.3d 998, 1004 (9th Cir. 2001). We disagree.

Although the Sixth Amendment to the United States Constitution guarantees the right to effective assistance of counsel, "indigent defendants with appointed counsel do not have the right to their counsel of choice." *State v. Hampton*, 184 Wn.2d 656, 662-63, 361 P.3d 734 (2015). Indigent defendants may move to substitute counsel "when there is an 'irreconcilable conflict' with appointed counsel." *Id.* at 663 (quoting *In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 723-24, 16 P.3d 1 (2001)). This court cannot review credibility determinations made by the trial court. *Morse v. Antonellis*, 149 Wn.2d 572, 574, 70 P.3d 125 (2003). In analyzing whether a trial court erred by failing to substitute counsel when a defendant alleged an irreconcilable conflict, this court reviews the extent of the conflict, the trial court's inquiry into the conflict, and the timeliness of the motion. *Stenson*, 142 Wn.2d at 723-24. If "irreconcilable differences" produced a complete breakdown of the attorney-client relationship, a defendant need not show prejudice to establish that they were denied effective assistance of counsel. *Id.* at 722.

A trial court conducts an adequate inquiry into a conflict "by allowing the defendant and counsel to express their concerns fully." *State v. Schaller*, 143 Wn. App. 258, 271, 177 P.3d 1139 (2007). "Formal inquiry is not always essential where the defendant otherwise states [their] reasons for dissatisfaction on the record." *Id.* The Washington Supreme Court has held that a trial court conducted an adequate inquiry by allowing the defendant to explain his reason for dissatisfaction with his attorney, then questioning counsel about the merits of the complaint. *State v. Varga*, 151 Wn.2d 179, 200-01, 86 P.3d 139 (2004). In *Schaller*, the defendant stated his concerns and was

questioned on the record about the conflict's effect on his case, and Division One held that no further inquiry was necessary. 143 Wn. App. at 271-72.

Racial bias is a pervasive issue in the criminal justice system, and racial animus is deeply troubling. However, the trial court heard from both Alvarez and the attorney on the record. Although Alvarez argues that the trial court should have conducted a more stringent inquiry, it is adequate to allow the defendant to express their concerns on the record, and an in camera hearing was not required under these circumstances. *Id.* Alvarez had a full opportunity to state his allegations and the attorney denied them, explaining that he asked about Alvarez's citizenship, which is a standard practice and "one of the first things you're supposed to do" as defense counsel due to the possible immigration consequences of a conviction. VRP (July 1, 2019) at 13. The trial court's resolution of the issue indicated that the trial judge found the attorney to be credible. Additionally, Alvarez's case was over 300 days old when he made his complaint, with trial set to begin in three weeks, and the same attorney had represented Alvarez for the entire duration of the case. Alvarez raised no further issues with his attorney prior to or during trial.

Alvarez relies on *State v. Berhe*, 193 Wn.2d 647, 444 P.3d 1172 (2019) (holding a prima facie showing that *implicit* racial bias affected a jury verdict requires an evidentiary hearing) and Judge Nguyen's concurrence in *Ellis v. Harrison*, 947 F.3d 555, 561-62 (9th Cir. 2020) (Nguyen, J., concurring). *Berhe* required a more thorough inquiry because a juror's implicit racial bias necessarily does not reveal itself as derogatory or racially charged remarks. 193 Wn.2d at 665-66. And the attorney in *Ellis* had an established history, substantiated by his coworkers and children, of using racial slurs against clients, court personnel, other lawyers, and even judges. 947 F.3d 556-57 (Nguyen, J., concurring). For these reasons, both cases are distinguishable.

17

We hold that the trial court did not abuse its discretion by denying Alvarez's motion for substitution of counsel.

## II. ACCOMPLICE TESTIMONY AND JURY INSTRUCTION

Alvarez argues that we should remand for a new trial because the failure to request a cautionary instruction regarding accomplice testimony constituted ineffective assistance of counsel, and it was reversible error for the trial court to not give the instruction. He argues defense counsel was ineffective in cross-examining Montgomery-Fisher and the trial court improperly curtailed cross-examination of Soria. We disagree.

A.    Accomplice Testimony Instruction

Alvarez argues that we should remand for a new trial because he received ineffective assistance of counsel due to the failure to request the cautionary accomplice testimony instruction, and it was reversible error for the trial court to not sua sponte give the instruction. The pattern cautionary instruction provides,

> Testimony of an accomplice, given on behalf of the [State], should be subjected to careful examination in the light of other evidence in the case, and should be acted upon with great caution. You should not find the defendant guilty upon such testimony alone unless, after carefully considering the testimony, you are satisfied beyond a reasonable doubt of its truth.

11 WASHINGTON PRACTICE: PATTERN JURY INSTRUCTIONS: CRIMINAL 6.05 (4th ed. 2015) (WPIC). If testimonial, documentary, or circumstantial evidence substantially corroborates the accomplice testimony, the failure to give this instruction is not reversible error. *State v. Harris*, 102 Wn.2d 148, 155, 685 P.2d 584 (1984), *overruled on other grounds by State v. McKinsey*, 116 Wn.2d 911, 810 P.2d 907 (1991).

1.    <u>Ineffective assistance of counsel</u>

The State argues that Alvarez cannot establish deficient performance or prejudice from the failure to request the prophylactic instruction because he was not entitled to the instruction due to the substantial corroboration of the accomplice testimony. We agree.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee effective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). To demonstrate that he received ineffective assistance of counsel, Alvarez must show (1) defense counsel's performance was deficient and (2) the deficient performance resulted in prejudice. *State v. Linville*, 191 Wn.2d 513, 524, 423 P.3d 842 (2018). Counsel's performance "is deficient if it falls 'below an objective standard of reasonableness based on consideration of all the circumstances.'" *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017) (quoting *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). Prejudice ensues if there is a "reasonable probability" that the result of the proceeding would have been different had defense counsel not performed deficiently—a mere "'conceivable effect on the outcome'" is not sufficient. *Id.* (internal quotation marks omitted) (quoting *State v. Crawford*, 159 Wn.2d 86, 99, 147 P.3d 1288 (2006)). The failure to demonstrate either prong will end our inquiry. *State v. Classen*, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018).

Courts strongly presume that counsel's performance was not deficient. *State v. Emery*, 174 Wn.2d 741, 755, 278 P.3d 653 (2012). To overcome this presumption, Alvarez "'must show in the record the absence of legitimate strategic or tactical reasons'" supporting defense counsel's conduct. *Id.* (quoting *McFarland*, 127 Wn.2d at 336). "But a defendant does not establish ineffective assistance simply by identifying an instruction that would have likely been given had

it been requested." *State v. Hayes*, 164 Wn. App. 459, 473, 262 P.3d 538 (2011), *abrogation on other grounds recognized by State v. Tyler*, 195 Wn. App. 385, 396, 382 P.3d 699 (2016). Where defense counsel's failure to request a particular jury instruction is the basis for a claim of ineffective assistance, the defendant must show they were "entitled to the instruction, counsel's performance was deficient in failing to request it, and the failure to request the instruction caused prejudice." *Classen*, 4 Wn. App. 2d at 540.

In 1984, the Supreme Court held that "it is always the better practice for a trial court to give the cautionary instruction whenever accomplice testimony is introduced" and that "failure to give this instruction is always reversible error when the prosecution relies *solely* on accomplice testimony." *Harris*, 102 Wn.2d at 155. But the Supreme Court simultaneously acknowledged that "whether failure to give this instruction constitutes reversible error when the accomplice testimony is corroborated by independent evidence depends upon the extent of corroboration." *Id.* If testimonial, documentary, or circumstantial evidence substantially corroborates the accomplice testimony, the failure to give the instruction is not reversible error. *Id.* In *Harris*, the Supreme Court held that there was no reversible error from the lack of cautionary instruction when other testimony and evidence corroborated the accomplice testimony. *Id*. at 156.

The Supreme Court more recently held in *In re Personal Restraint of Sandoval* that a defendant was not entitled to the cautionary instruction where there was an abundance of corroborating evidence. 189 Wn.2d 811, 824, 408 P.3d 675 (2018). There, the corroborating evidence included recorded statements the defendant made to the police, nonaccomplice testimony corroborating the defendant's attendance at gang meetings, physical evidence recovered from the vehicle used for the charged crime, and eyewitness testimony about the crime. *Id.*

Although *Harris* suggested that a defendant would be entitled to the cautionary instruction "whenever accomplice testimony is introduced," the more recent analysis in *Sandoval* explains that a trial court can refuse a request to give the instruction where other evidence substantially corroborates the accomplice testimony. *Harris*, 102 Wn.2d at 155; *see also Sandoval*, 189 Wn.2d at 824. This is consistent with the last sentence of the pattern instruction, which addresses a situation where the only evidence is accomplice testimony: "You should not find the defendant guilty *upon such testimony alone* unless, after carefully considering the testimony, you are satisfied beyond a reasonable doubt of its truth." WPIC 6.05 (emphasis added).

Here, the State produced testimony from several witnesses establishing that the three accomplices, including Alvarez, left and returned to the Graham property together in the same vehicle that was used in the shooting. Surveillance footage from shortly before the shooting showed Alvarez wearing a black hooded sweatshirt matching Evans's description of the shooter's clothing while Montgomery-Fisher and Soria wore different clothing. Witnesses also testified that Alvarez melted components of a gun after the shooting, and an ammunition magazine containing the same caliber of bullets used in the shooting was found under Alvarez's bed. There was also testimony that had someone fired a gun from the driver's seat, instead of the back seat where Alvarez was sitting, the shell casings would likely have landed inside the vehicle instead of being found at the scene. And finally, the State played incriminating jail phone calls from Alvarez to Anderson.

This case strongly resembles *Sandoval*. The State's direct evidence substantially corroborates Montgomery-Fisher and Soria's testimony that Alvarez was the third person in the car on the night of the shooting. And there was corroborating testimony from Evans as well as

circumstantial evidence and testimony from other witnesses establishing that Alvarez was the shooter.

Under *Sandoval*, Alvarez was not entitled to the instruction because there was substantial corroborating testimony in addition to the accomplices' testimony. 189 Wn.2d at 824. Counsel's failure to request the instruction was not deficient. *Harris*, 102 Wn.2d at 155. And even though he could arguably have requested it, "a defendant does not establish ineffective assistance simply by identifying an instruction that would have likely been given had it been requested." *Hayes*, 164 Wn. App. at 473. The corroborating evidence described above also makes it unlikely the instruction would have influenced the jury because its plain language focuses on situations where the accomplice testimony is the *only* evidence. Here the accomplice testimony was not the only evidence. Thus, Alvarez has not shown prejudice resulted from the absence of the instruction.

We hold that defense counsel's failure to request the cautionary accomplice testimony instruction did not fall below an objective standard of reasonableness because Alvarez was not entitled to the instruction, counsel's performance was not deficient, and Alvarez was not prejudiced by the absence of the instruction in light of the corroborating evidence.

2. Trial court error

Alvarez also argues that the trial court's failure to sua sponte order a cautionary instruction violated his constitutional "right [to] a fair trial with jurors who accurately understand the controlling legal principles." Br. of Appellant at 26. For the reasons discussed above, the trial court did not err by failing to give the instruction.

B.   Cross-Examination of Accomplices

    1.   Impeachment of Montgomery-Fisher

Alvarez also argues it was ineffective assistance for defense counsel to not cross-examine Montgomery-Fisher about a second degree theft conviction after raising his convictions for third degree theft and false statement to a public official. The State argues defense counsel properly cross-examined Montgomery-Fisher within the limitations imposed by the trial court and that any deficiency did not prejudice Alvarez.

As a preliminary matter, it does not appear from our record that Montgomery-Fisher was ever convicted of second degree theft. Instead, the sole reference to a second degree theft was a slip of the tongue. 9 VRP at 1172 ("Your Honor, and you do not want me to ask him about the theft in the second degree on the same date as the false statement -- *excuse me -- the theft in the third degree*." (emphasis added)). Defense counsel sought permission to impeach Montgomery-Fisher with convictions for four prior third degree thefts and one prior false statement to a public servant. The trial court permitted counsel to question Montgomery-Fisher about two third degree thefts and one false statement because those convictions were "recent in history and . . . necessary for a fair determination of the issues." *Id.* at 1171. The rest of the convictions were cumulative.

The extent of cross-examination is a matter of judgment and strategy within the professional discretion of counsel. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 720, 101 P.3d 1 (2004). "This court will not find ineffective assistance of counsel based on trial counsel's decisions during cross-examination if counsel's performance fell within the range of reasonable representation." *State v. Johnston*, 143 Wn. App. 1, 20, 177 P.3d 1127 (2007). If the failure to cross-examine or impeach a witness is the basis for an ineffective assistance of counsel claim, the

defendant must show that testimony elicited thorough cross-examination could have overcome the evidence against the defendant. *Davis*, 152 Wn.2d at 720; *Johnston*, 143 Wn. App. at 20.

Here, defense counsel impeached Montgomery-Fisher with his false statement to a public official and one of the third degree thefts, even though reference to two third degree thefts was allowed. Defense counsel also elicited testimony that Montgomery-Fisher had a reputation as a "storyteller" and had lied to the police during their investigation of the shooting. 10 VRP at 1512. The fact that defense counsel could have performed a marginally more complete impeachment of Montgomery-Fisher by questioning him about an additional third degree theft conviction does not demonstrate deficient performance, and Alvarez does not show any resulting prejudice. *Emery*, 174 Wn.2d at 755. We hold that defense counsel's performance in cross-examining Montgomery-Fisher did not fall below an objective standard of reasonableness, and Alvarez has not shown prejudice.

2.    Cross-examination regarding Soria's plea deal

Alvarez argues that the trial court improperly curtailed defense counsel from fully exploring the benefit that Soria received for testifying. Alvarez argues this violated his right to confront witnesses and present a defense. We disagree.

The Sixth Amendment right to confront witnesses includes the right to cross-examine those witnesses about their motivations for testifying. *Davis v. Alaska*, 415 U.S. 308, 316-17, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974). The scope of cross-examination is subject to "the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation." *Id*. at 316. We review limits on the scope of cross-examination for abuse of discretion. *State v. Lee*, 188 Wn.2d 473, 486, 396 P.3d 316 (2017). A trial court abuses its discretion when its decision is "'manifestly

24

unreasonable or based upon untenable grounds or reasons.'" *Id*. (internal quotation marks omitted) (quoting *State v. Garcia*, 179 Wn.2d 828, 844, 318 P.3d 266 (2014)).

The trial court ruled the jury could hear that, without a plea deal, Soria faced a possible life sentence and a strike offense, but it barred defense counsel from raising that Soria faced a life sentence specifically because he was on his third strike offense. The trial court ruled that specific reference to the two prior strike offenses was not relevant after hearing argument from the State that the prior strikes would constitute criminal history that would otherwise be excluded. The jury did hear that, because of his plea deal, the State would recommend 32 years rather than life, so long as the prosecution was "happy" with his testimony in Alvarez's trial. 10 VRP at 1509. Defense counsel also impeached Soria with a prior third degree theft conviction. Given that Soria was a convicted felon who pleaded guilty to murder in this case, further detail about his criminal history would have been cumulative as well as possibly inadmissible, and it was not unreasonable for the trial court to exclude specific reference to prior strikes. *Davis*, 415 U.S. at 316.

We hold that the trial court did not abuse its discretion by limiting defense counsel's cross-examination of Soria to the anticipated reduction of Soria's recommended sentence and the fact that this would otherwise be a strike offense.

### III. FIRST DEGREE ATTEMPTED MURDER INSTRUCTION

Alvarez also argues that we should vacate his attempted first degree murder conviction because the to convict instruction referred to "'intent to commit murder in the first degree'" instead of specifying that premeditated intent was required, thereby omitting an element of the charged crime. Br. of Appellant at 54. We disagree.

Defense counsel did not object to the attempted first degree murder jury instruction below. But it is manifest constitutional error reviewable for the first time on appeal if a jury instruction omits an element of the charged crime. *State v. O'Hara*, 167 Wn.2d 91, 100-01, 217 P.3d 756 (2009).

In *State v. Orn*, 197 Wn.2d 343, 362, 482 P.3d 913 (2021), the jury received a to convict instruction stating that to convict the defendant of attempted murder in the first degree the jury had to find beyond a reasonable doubt "'(1) [t]hat . . . the defendant did an act that was a substantial step toward the commission of murder in the first degree; (2) [t]hat the act was done with the intent to commit murder in the first degree; and (3) [t]hat the act occurred in . . .Washington.'" Another instruction defined "first degree murder" as "'[a] person commits the crime of murder in the first degree when, with a premeditated intent to cause the death of another person, he or she causes the death of such person unless the killing is justifiable.'" *Id*. at 363.

The Supreme Court explained that the to convict instruction for an attempt crime must contain the essential elements of attempt, but it need not also contain the elements of the substantive crime attempted. *Id*. at 362. The elements of the substantive crime may be provided in a separate definitional instruction. *Id*. In *Orn*, "the jury could not have convicted Orn of attempted first degree murder without finding that he took a substantial step toward committing first[]degree murder with the premeditated intent to cause the death of another." *Id*. at 363. The to convict instruction did not omit any essential element of the crime of attempted first degree murder and, "'taken as a whole,'" the instructions properly informed the jury of the law. *Id*. (quoting *State v. Tili*, 139 Wn.2d 107, 126, 985 P.2d 365 (1999)).

Here instruction 33, the to convict instruction for attempted first degree murder, was consistent with the instruction approved in *Orn.* To convict Alvarez of attempted first degree murder, the jury had to find beyond a reasonable doubt "(1) [t]hat on or about July 18, 2018, the defendant or an accomplice did an act that was a substantial step toward the commission of murder in the first degree; (2) [t]hat the act was done with the intent to commit murder in the first degree; and" (3) that the act occurred within Washington. CP at 113. Instruction 9, the definitional instruction for first degree murder, CP at 89, was identical to the comparable instruction in *Orn*: "'A person commits the crime of murder in the first degree when, with a premeditated intent to cause the death of another person, he causes the death of such person or of a third person.'" 197 Wn.2d at 363. Instruction 31 defining "attempted first degree murder" stated, "For the purpose of this charge, you may not consider murder in the first degree as it is defined in Instruction Number 19," which described extreme indifference murder, and expressly directed the jury to use the instruction 9 definition of "premeditated murder." CP at 111.

We follow *Orn* and hold that the jury was properly instructed.

## IV. PROSECUTORIAL MISCONDUCT

### A. Vouching

Alvarez argues that we should remand for a new trial because the prosecutor improperly vouched for the credibility of the State's witnesses. Because Alvarez does not demonstrate prejudice, we disagree.

A defendant bears the burden of proving that the prosecutor's challenged conduct was both improper and prejudicial. *Emery*, 174 Wn.2d at 756. If a defendant establishes that the prosecutor's statements were improper and an objection preserved the issue, the defendant must then show that

the prosecutor's misconduct "had a substantial likelihood of affecting the jury's verdict" to establish prejudice. *Id*. at 760. Here, defense counsel objected to all three instances of alleged misconduct.

This court reviews a prosecutor's allegedly improper arguments "in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the [jury] instructions." *State v. Russell*, 125 Wn.2d 24, 85, 882 P.2d 747 (1994). A prosecutor may not express a personal opinion regarding "the credibility of witnesses or the guilt or innocence of the accused." *State v. Calvin*, 176 Wn. App. 1, 19, 316 P.3d 496 (2013). But, a prosecutor "may freely comment on witness credibility based on the evidence." *State v. Lewis*, 156 Wn. App. 230, 240, 233 P.3d 891 (2010). "Improper vouching occurs when the prosecutor expresses a personal belief in the veracity of a witness or indicates that evidence not presented at trial supports the testimony of a witness." *State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011). Even improper remarks do not require reversal "if they were invited or provoked by defense counsel and are in reply to [their] acts and statements, unless the remarks are not a pertinent reply or are so prejudicial that a curative instruction would be ineffective." *Russell*, 125 Wn.2d at 86.

B.    Testimony About the Hallway Conversation on Redirect

In *State v. Ish*, five justices agreed that it was improper for a prosecutor to ask a witness about their promise to testify truthfully on direct examination, but in that case, the witness's credibility had not previously been attacked. 170 Wn.2d 189, 199, 201, 241 P.3d 389 (2010) (Chambers, J., lead opinion) (four justices agreed that the error was harmless; one believed that it was not harmless); *id.* at 206 (Sanders, J., dissenting). Here, on cross-examination, defense counsel attacked Montgomery-Fisher's credibility by impeaching him with his third degree theft and false

statement convictions and his lies to the police. And defense counsel promoted the theory that Montgomery-Fisher was the real shooter throughout the trial. On redirect, the State sought to rehabilitate Montgomery-Fisher's credibility using the hallway conversation with the prosecutor, asking, "What did I tell you to do?" 9 VRP at 1309. Montgomery-Fisher responded, "Be honest." *Id*. The prosecutor continued, "Do you remember me telling you I don't know your truth?" and "I wasn't there. I don't know what happened?" *Id*. Defense counsel objected and the trial court said it would allow the testimony. The prosecutor then asked, "What did I emphasize you do?" and Montgomery-Fisher answered, "Tell the truth." *Id.* at 1310.

Regardless of whether the prosecutor's line of questioning about the hallway conversation was improper, Alvarez has not established prejudice. Because defense counsel objected, Alvarez must demonstrate that there was a substantial likelihood that the misconduct had an effect on the jury's verdict. *Emery*, 174 Wn.2d 760. The jury received overwhelming evidence placing Alvarez in the back seat of the vehicle wearing the same clothing as the shooter Evans saw, which corroborated much of Montgomery-Fisher's testimony. And Soria's and Montgomery-Fisher's testimony was largely consistent with the above evidence. The jury also heard that Alvarez attempted to melt a gun in a fire later that night, and police found ammunition matching the murder weapon's underneath his bed. The prosecutor's exchange with Montgomery-Fisher was unlikely to have affected the jury's verdict, given the weight of the other evidence against Alvarez. Thus, we hold that the testimony regarding the exchange between the prosecutor and Montgomery-Fisher in the courthouse hallway was not prejudicial.

C.      Commentary on Evans's and Montgomery-Fisher's Credibility in Closing

Prosecutors "'are permitted latitude to argue the facts in evidence and reasonable inferences' in their closing arguments." *State v. Dhaliwal*, 150 Wn.2d 559, 577, 79 P.3d 432 (2003) (quoting *State v. Smith*, 104 Wn.2d 497, 510, 707 P.2d 1306 (1985)). And "a prosecutor is entitled to point out the improbability or lack of evidentiary support for the defense theory of the case." *State v. Osman*, 192 Wn. App. 355, 367, 366 P.3d 956 (2016). However, they "may not express an individual opinion of the defendant's guilt, independent of the evidence actually in the case." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 706, 286 P.3d 673 (2012). The Supreme Court found no misconduct, for example, where a prosecutor emphasized the consistency of the victim's statements based on evidence presented at trial. *Thorgerson*, 172 Wn.2d at 447-48.

Here, defense counsel repeatedly attacked Evans's and Montgomery-Fisher's credibility throughout the trial, and he emphasized that Evans had not always been consistent in what she remembered of the shooting. The prosecutor addressed Evans's credibility in closing argument. He insisted that Evans was "close enough to see what happened" during the shooting, and because "[s]he was capable of seeing" what happened, her testimony "can be trusted." 12 VRP at 1767. Defense counsel made a vouching objection, and the trial court reminded the jury that their role was "to decide the credibility of each witness." *Id.* This argument, similar to *Thorgerson*, was a permissible inference based on the evidence regarding Evans's proximity to the shooter and her line of sight. 172 Wn.2d at 447-48. We hold that this comment was based on evidence and within the bounds of proper closing argument, and the trial court's admonition would have cured any prejudice.

The prosecutor also sought to rehabilitate Montgomery-Fisher's credibility, stating that he was "not some mastermind" and "not a terribly intelligent guy" before asserting, "It doesn't mean that [he] wasn't an agitator that night. I'm sure he was. But he's not the person on the stand who's lying when he tells you who the real shooter was." 12 VRP at 1779-80. After defense counsel objected the prosecutor stated, "I want to be clear. I'm not giving you my personal opinion. I'm giving you an opinion of what the evidence represents and what you should conclude the evidence represents." *Id.* at 1780.

These comments were made to undermine the defense theory of the case that Montgomery-Fisher was the true shooter. Under *Osman*, it is permissible for a prosecutor to highlight the "lack of evidentiary support for the defense theory of the case." 192 Wn. App. at 367. The prosecutor tied any opinion back to "what the evidence represents."12 VRP at 1780. Given the full context of the exchange and the prosecutor's emphasis that he was not expressing his personal opinion, the prosecutor's argument was not improper.

We hold that the prosecutor's questions during redirect examination of Montgomery-Fisher were not prejudicial. And we hold that the prosecutor's comments in closing were not improper. Thus, we find no prosecutorial misconduct requiring reversal.

Alvarez finally argues that we should remand for a new trial because "ineffective assistance, the prosecution's impermissible vouching for its witnesses, and the court's failure to rectify these errors cumulatively show Mr. Alvarez was denied a fair trial with competent counsel." Br. of Appellant at 49. We conclude, however, that cumulative error did not deprive Alvarez of his right to a fair trial.

31

## V. DOUBLE JEOPARDY

Alvarez argues that this court should vacate his drive-by shooting conviction because it imposes multiple punishments for the same conduct already covered by the murder and attempted murder convictions. We disagree.

Both the United States Constitution and the Washington Constitution bar multiple punishments for the same offense unless the legislature intended to authorize cumulative punishments. U.S. CONST. amend. V; WASH. CONST. art. I, § 9; *In re Pers. Restraint of Borrero*, 161 Wn.2d 532, 536, 167 P.3d 1106 (2007). In reviewing a double jeopardy claim, we look first to the language of the relevant statutes. *Borrero*, 161 Wn.2d at 536-37. If the statutory language does not disclose any legislative intent to impose multiple punishments for the offenses, this court applies the same evidence test, which asks whether the offenses are identical in fact and in law. *Id*. "Under this test, double jeopardy principles are violated if the defendant is convicted of offenses that are identical in fact and in law." *Id.* at 537. But if each offense contains an element not contained in the other, requiring proof of a fact that the other does not, the offenses are not the same. *Id.* Division Three has held that convictions for second degree assault and drive-by shooting did not violate double jeopardy because each crime requires proof of facts not required by the other. *State v. Statler*, 160 Wn. App. 622, 639, 248 P.3d 165 (2011).

RCW 9A.32.030(1)(a) provides, "A person is guilty of murder in the first degree when: [w]ith a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person." RCW 9A.28.020(1) states that a defendant "is guilty of an attempt to commit a crime if, with intent to commit a specific crime, he or she does any act which

is a substantial step toward the commission of that crime." And RCW 9A.36.045 governs drive-by shooting convictions:

> (1) A person is guilty of drive-by shooting when he or she recklessly discharges a firearm . . . in a manner which creates a substantial risk of death or serious physical injury to another person and the discharge is either from a motor vehicle or from the immediate area of a motor vehicle that was used to transport the shooter or the firearm, or both, to the scene of the discharge.

> (2) A person who unlawfully discharges a firearm from a moving motor vehicle may be inferred to have engaged in reckless conduct, unless the discharge is shown by evidence satisfactory to the trier of fact to have been made without such recklessness.

None of the statutes expressly authorizes multiple convictions for a single act.

Applying the same evidence test to the charges and evidence in this case weighs against concluding that double jeopardy prevents the multiple convictions. Drive-by shooting requires the reckless discharge of a firearm, which murder and attempted murder do not. RCW 9A.36.045(1). Premeditated first degree murder requires premeditated intent to cause the death of another person, which drive-by shooting does not. RCW 9A.32.030(1)(a). And first degree attempted murder requires intent to commit first degree murder, which drive-by shooting does not. RCW 9A.28.020(1). The murder and attempted murder charges in this case had different victims, so those convictions are not identical in fact. *See In re Pers. Restraint of Sarausad*, 109 Wn. App 824, 852, 39 P.3d 308 (2001).

Alvarez relies on *In re Personal Restraint of Orange*, 152 Wn.2d 795, 100 P.3d 291 (2004). There, the Supreme Court held that convictions of first degree attempted murder and first degree assault of the same victim for a single gunshot violated the prohibition against double jeopardy, even though on the face of the relevant statutes, each crime required proof of an element that the

other did not. *Id.* at 817, 820. Analyzing the particular facts of that case, the court concluded that "[t]he two crimes were based on the same shot directed at the same victim, and the evidence required to support the conviction for first degree attempted murder was sufficient to convict Orange of first degree assault." *Id.* at 820. Alvarez argues that this case is like *Orange* in part because the convictions were based on the same shots.

Division One has declined to extend *Orange*'s holding beyond cases "where evidence of the same single act was *required* to support each conviction." *State v. Nysta*, 168 Wn. App. 30, 48, 275 P.3d 1162 (2012) (holding that conviction for felony harassment committed in the course of second degree rape did not violate double jeopardy because the threat supported but was not required to prove forcible compulsion element of rape). And this court held that assault and attempted murder charges did not violate double jeopardy in *State v. Davis* when the defendant fired multiple shots at the same victim using two different firearms. 174 Wn. App. 623, 634, 300 P.3d 465 (2013).

Premeditated first degree murder and attempted first degree murder each require specific intent. RCW 9A.32.030(1)(a), .28.020(1). Drive-by shooting requires only recklessness, and indeed the statute presumes recklessness from the conduct of firing a gun out of a moving vehicle. RCW 9A.36.045(2). It is possible that a jury could convict a defendant of drive-by shooting but acquit them of murder—or convict for murder and acquit for drive-by shooting. Thus, attempted murder and drive-by shooting are not the same in law because each has an element not included in the other. *Borrero*, 161 Wn.2d at 537. They are also not the same in fact in this case, because each offense required proof of a fact the other did not. Here, witnesses testified that multiple shots were fired into Evans's car. 6 VRP at 676 (Evans testified that there were multiple gunshots), 7 VRP at

34

794 (neighbor who called 911 heard six gunshots), 10 VRP at 1343-44 (six spent shell casings recovered from scene). While at least one bullet killed Doss and another wounded Evans, still more were recklessly fired from Montgomery-Fisher's car creating substantial risk of death or serious injury. Thus, we hold that this case is different from *Orange*. Alvarez's convictions for first degree murder, first degree attempted murder, and drive-by shooting did not violate double jeopardy.

## VI. SENTENCING

### A.     Consideration of Youth at Sentencing

Alvarez argues that we should remand for a new sentencing hearing because the trial court misunderstood its discretion at sentencing and misapplied the law when it found that *Houston-Sconiers* did not apply to Alvarez's case. Alvarez also argues that the trial court should have sua sponte turned to the framework in *State v. O'Dell*, 183 Wn.2d 680, 358 P.3d 359 (2015), to guide its sentencing. We disagree.

Every defendant is entitled to ask a sentencing court to impose an exceptional sentence below the standard range and have the court consider the request. *State v. Grayson*, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005). Alvarez sought an exceptional sentence below the standard range, but the trial court imposed an exceptional sentence above the standard range instead. We review a denial of an exceptional sentence to determine if the trial court failed to exercise discretion or abused its discretion by ruling on an impermissible basis. *State v. McGill*, 112 Wn. App. 95, 100, 47 P.3d 173 (2002).

The Supreme Court in *Houston-Sconiers* granted trial courts expansive sentencing discretion for *juvenile* defendants, but it does not apply to adult defendants. 188 Wn.2d at 21. And although a trial court must expressly consider "hallmark features of youth" when sentencing a

juvenile under *Houston-Sconiers* and its progeny, there is no similar requirement when trial courts are sentencing adults. *State v. Wright*, 19 Wn. App. 2d 37, 46-47, 493 P.3d 1220 (2021) (holding "'children are different'" logic did not apply to 28-year-old defendant); *see also State v. Brown*, 13 Wn. App. 2d 288, 291, 466 P.3d 244, *review denied*, 196 Wn.2d 1013 (2020) (same for 31-year-old).

For young adult defendants, youth *may* mitigate culpability but "age is not a per se mitigating factor automatically entitling every youthful defendant to an exceptional sentence." *O'Dell*, 183 Wn.2d at 695. In *O'Dell,* the Supreme Court held a trial court abused its discretion by concluding that prior case law absolutely prohibited it from considering whether youth diminished the defendant's capacity to control or appreciate the wrongfulness of his conduct. *Id.* at 696-97. Today, if youth relates to a defendant's crime, it can "amount to a substantial and compelling factor, in particular cases, justifying a sentence below the standard range." *Id.* at 696.

The Supreme Court recently identified a "constitutionally significant" difference between the brains of "18 to 20-year olds . . . and persons with fully developed brains." *In re Pers. Restraint of Monschke*, 197 Wn.2d 305, 325-26, 482 P.3d 276 (2021) ("Not every 19- and 20-year-old will exhibit these mitigating characteristics, just as not every 17-year-old will."). The Supreme Court has declined to find reduced culpability for defendants under the three strikes law where the defendants began committing crimes when they were 19 and 21 years old and continued to commit crimes in their 30s and 40s, and they did not produce evidence that youth contributed to the previous crimes or the instant offenses. *State v. Moretti*, 193 Wn.2d 809, 824-26, 446 P.3d 609 (2019). And Division One has held, "Neither [*Houston-Sconiers* nor *O'Dell*] stand[s] for the proposition that a trial court must make findings of fact concerning a defendant's youth or that an

attorney must make arguments based upon a defendant's youth whenever a defendant is anywhere close to the age of 18." *State v. Roach*, 18 Wn. App. 2d 98, 113-14, 489 P.3d 283, *review denied*, 198 Wn.2d 1022 (2021).

Alvarez was 22 at the time of the shooting, so the trial court was correct that *Houston-Sconiers* is inapplicable. Neither party mentioned *O'Dell* at sentencing. No presentence investigation report or sentencing memorandum is included in our record. Defense counsel did request an exceptional downward sentence based on Alvarez's youth and the relatively minor injuries to Evans. Alvarez informed the court of his troubled childhood, as well as difficulties in school and at home, and he stated that "getting in trouble" was "all [he] knew." 14 VRP at 1892.

But youth is not a per se mitigating factor. *O'Dell*, 183 Wn.2d at 695. Under *O'Dell*, a sentencing court must consider the defendant's youth only if it relates to the offense and "amount[s] to a substantial and compelling factor . . . justifying a sentence below the standard range." *Id.* at 696. In this case, three men between the ages of 20 and 25 drove from Graham to Tacoma with the intent to retaliate against a specific gang, accosting multiple people and questioning their gang affiliations until they stumbled across Doss.

The trial court heard from Alvarez and defense counsel about Alvarez's troubled youth and the new developments in brain science and did not refuse to consider the information. The trial court recognized that it had discretion to consider Alvarez's youth. Here, the trial court decided that none "of the facts that applied in *Houston-Sconiers* apply here," based on the underlying gang motivation and the amount of time all three accomplices had to reconsider their actions. 14 VRP at 1896. The trial court emphasized, "I think this was thought of, premeditated, and was an execution" where all the occupants of the car "had a lot of time to go back and think about it"

while they drove from Graham to Tacoma and searched the city for a member of the appropriate gang. *Id.* at 1895-96. Thus, the trial court considered Alvarez's youth and whether this crime was impulsive, and the court denied Alvarez's request for an exceptional downward sentence. To date there is no requirement that the trial court expressly address particular factors when considering an exceptional downward sentence for someone who was over 18 when he committed the relevant crimes.

We hold that the trial court did not fail to exercise its discretion when it declined to impose an exceptional downward sentence based on Alvarez's age at the time of the crime.

B.      Written Findings

Alvarez argues, and the State concedes, that the trial court erred by failing to enter written findings of fact and conclusions of law supporting the exceptional sentence above the standard range. Under RCW 9.94A.535 written findings are mandatory. *State v. Friedlund*, 182 Wn.2d 388, 393, 341 P.3d 280 (2015). Therefore, we remand for the trial court to enter written findings supporting the exceptional sentence. RAP 7.2(e); RCW 9.94A.535.

C.      LFOs

Alvarez argues that the trial court improperly imposed community custody supervision fees and a $100 DNA collection fee after orally stating at sentencing that only the crime victim penalty assessment was mandatory in Alvarez's case and appearing to waive the DNA collection fee. The State concedes both fees should be stricken.

The remedy for a clerical error in a judgment and sentence is to remand to the trial court for correction. *State v. Makekau*, 194 Wn. App. 407, 421, 378 P.3d 577 (2016). We accept the State's concession that the supervision fee provision should be stricken.

RCW 43.43.7541 governs the DNA collection fee, stating that every felony sentence "*must* include a fee of one hundred dollars *unless* the state has previously collected the offender's DNA as a result of a prior conviction." (Emphasis added.) Thus, this fee is mandatory if the State has not previously collected the offender's DNA. *State v. Mathers*, 193 Wn. App. 913, 921, 376 P.3d 1163 (2016). Here, Alvarez had a juvenile felony conviction for residential burglary, which makes it possible that he already had a DNA sample taken, but that is not certain based on the record before us.

We remand for the trial court to strike the community custody supervision fee and to determine whether the State previously collected Alvarez's DNA. If the State already collected Alvarez's DNA, the trial court should strike the DNA collection fee.

VII. SAG ARGUMENTS

Alvarez duplicates counsel's argument that the prosecutor committed misconduct by presenting his own opinion. This argument is addressed above. Alvarez also argues that he was wrongfully convicted by false testimony from Evans, and that there was insufficient evidence to corroborate his accomplices' testimony. He argues that because Evans did not describe him or say that Alvarez was the person who shot her, the only evidence indicating that Alvarez was the shooter was the testimony of his accomplices, who he accuses of "not fully tell[ing] the truth on the stand." SAG at 1.

Evidence is sufficient to support a conviction if, after reviewing the evidence in the light most favorable to the State, we are satisfied that "'any rational trier of fact could have found guilt beyond a reasonable doubt.'" *State v. Frahm*, 193 Wn.2d 590, 595, 444 P.3d 595 (2019) (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). In considering a defendant's claim

of insufficient evidence, we accept the State's evidence as true and draw all reasonable inferences from the evidence in favor of the State. *Salinas*, 119 Wn.2d at 201. We will not review credibility determinations made by the finder of fact. *Morse*, 149 Wn.2d at 574.

Evans testified that the shooter was wearing a dark hood, which Alvarez was wearing in security footage from the 7-Eleven minutes before the shooting, compared to Soria's white T-shirt and Montgomery-Fisher's black T-shirt. And even without Evans identifying Alvarez as the shooter, a reasonable jury could have found that the State proved the elements of first degree murder, first degree attempted murder, and drive-by shooting beyond a reasonable doubt. As discussed above, the State offered other evidence substantially corroborating Montgomery-Fisher's and Soria's testimony that Alvarez was present in the vehicle at the time of the shooting, plus evidence that a magazine of ammunition was found under Alvarez's bed and that Alvarez tried to melt a gun in a bonfire. We hold that sufficient evidence supported Alvarez's convictions for first degree murder, first degree attempted murder, and drive-by shooting.

## CONCLUSION

We affirm Alvarez's convictions. We remand for the trial court to enter written findings of fact and conclusions of law justifying the exceptional sentence, strike community custody supervision fees from the judgment and sentence, and determine whether the State previously collected Alvarez's DNA. If the State has already collected Alvarez's DNA, the trial court should strike the DNA collection fee. We otherwise affirm Alvarez's sentence. Alvarez is not entitled to resentencing at this time.

No. 54284-6-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, A.C.J.

We concur:

Worswick, J.

Price, J.